RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0103P (6th Cir.)
File Name: 03a0103p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CHARLIE LEE MITCHELL,
    *Petitioner-Appellee,*

    *v.*

WARDEN GERALD MASON,
    *Respondent-Appellant.*

No. 99-1839

On Remand from the United States Supreme Court.
No. 98-71338—Arthur J. Tarnow, District Judge.

Decided and Filed: April 7, 2003

Before: DAUGHTREY and MOORE, Circuit Judges;
CARR, District Judge.[*]

---

MOORE, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. CARR, D. J. (pp. 27-28), delivered a separate dissenting opinion.

---

[*] The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. Petitioner-Appellee Charlie Lee Mitchell ("Mitchell") was convicted in a Michigan state court of second-degree murder and sentenced to a term of ten to fifteen years' imprisonment. Throughout his six-month confinement in custody awaiting trial, Mitchell sought to have new counsel appointed to his case because he claimed that his court-appointed lawyer refused to meet with him. Mitchell's motion to replace his counsel was addressed by the state trial court on the second day of jury selection and was subsequently denied. Mitchell's claim of ineffective assistance of counsel was rejected in his direct appeals in the Michigan courts, but the federal district court in the Eastern District of Michigan granted Mitchell's habeas petition on the ineffective assistance claim. We affirmed, *Mitchell v. Mason*, 257 F.3d 554 (6th Cir. 2001), but the Supreme Court vacated our decision and remanded the case for our further consideration in light of *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843 (2002). Although *Bell* changes our analysis, it does not change our conclusion that Mitchell was denied the effective assistance of counsel, and we **AFFIRM** the district court.

## I. BACKGROUND

Charlie Lee Mitchell was arrested and charged with first-degree murder for the death of Raymond Harlin, who was killed after a fight broke out in Mitchell's kitchen on October 3, 1988. On October 6, 1988, Gerald K. Evelyn was appointed counsel for Mitchell. Evelyn represented Mitchell at a preliminary examination on October 14, 1988, during which he called one witness and argued against the denial of bail. Evelyn next represented Mitchell, close to four months later, at the final conference on February 3, 1989. On April 5, 1989, Evelyn was suspended from practicing law in the State

of Michigan.[1] He was reinstated on May 8, 1989, the day jury selection began for Mitchell's trial.

At Mitchell's trial, Evelyn did not present an opening argument. Mitchell did not testify, nor did Evelyn present any witnesses on Mitchell's behalf. At the close of the prosecution's case, Evelyn moved for a directed verdict. The court partially granted the motion by reducing the charge to second-degree murder. During closing arguments, Evelyn argued that Thompson's testimony was equivocal and that the prosecution had not carried its burden of proof. The jury convicted Mitchell of second-degree murder on May 17, 1989. Mitchell was sentenced by the trial judge to ten to twelve years' imprisonment and then resentenced to ten to fifteen years' imprisonment due to a miscalculation in his original sentence.

Prior to the trial, Mitchell wrote six separate letters to the trial judge, the chief judge, and others requesting new counsel. Mitchell alleged that Evelyn had not visited him once in prison nor had Mitchell had the opportunity to speak with his lawyer in court. On April 27, 1989, eleven days before jury selection was to begin, the trial court held a hearing on Mitchell's "Motion for Withdrawal of Counsel" at which Mitchell appeared on his own behalf. Evelyn did not appear for the hearing, although he had notice of it. At the hearing, Mitchell informed the court that he had received a letter from his counsel informing him that he was suspended for a month. He also asked for a new lawyer and a postponement of the trial to afford a new lawyer the chance to review his case. Because Evelyn was not present, the trial court held the motion on advisement.

On the second day of jury selection, May 9, 1989, Mitchell again renewed his motion for new counsel. At that point, Evelyn, who had been reinstated the day before, informed the court that Mitchell wanted him removed because he had failed

---

[1] The record does not indicate why Evelyn was suspended.

to visit him the night before in prison as promised. The district court denied Mitchell's motion without prejudice.

On May 15, 1989, the sixth day of trial, Evelyn informed the court that he had received a grievance letter filed by Mitchell with the Attorney Grievance Commission on May 1, 1989. He then offered to have himself removed from the case. In response to questions from the court, Mitchell then stated, "I would like to, you know, cancel that grievance, you know, because all the motions and everything that I requested have been answered. . . . I'm satisfied, your Honor." J.A. at 192.

On direct appeal, Mitchell was granted an evidentiary hearing, known as a *Ginther* hearing, on the effective assistance of his trial counsel. *See People v. Ginther*, 212 N.W.2d 922 (Mich. 1973). At the hearing, which occurred before the same judge who presided over the trial, Mitchell presented the testimony of four witnesses, including Mitchell's mother. Mitchell himself also testified. Mitchell's appellate counsel did not call his trial counsel, Evelyn, to the stand. Appellate counsel introduced two witnesses who had been present at Mitchell's apartment on the night of Harlin's murder to establish that they were material witnesses and that Evelyn neither contacted them nor called them to testify at trial. Mrs. Mitchell's testimony was offered to establish her numerous efforts to contact Evelyn and to inform him that there were other witnesses whom he should interview. Mitchell also testified to his efforts to contact Evelyn and discuss his case with his lawyer. After the hearing, the trial judge found that Mitchell had not demonstrated objective unreasonableness or prejudice as required by state law and that he had received effective assistance of counsel.

The Michigan Court of Appeals, *see People v. Mitchell*, No. 118832 (Mich. Ct. App. Jan. 5, 1994), and the Michigan Supreme Court, *see People v. Mitchell*, 560 N.W.2d 600, 602 (Mich. 1997), affirmed Mitchell's conviction. On Mitchell's ineffective assistance of counsel claims, the Michigan Supreme Court first found that Evelyn's suspension did not

constitute a "per se" denial of counsel during a critical stage of the proceedings under *United States v. Cronic*, 466 U.S. 648 (1984). That court rejected Mitchell's contention that his case warranted a presumptive finding of ineffectiveness under the Sixth Amendment, concluding that Mitchell's claim presented neither a circumstance in which it was unlikely that any lawyer could provide effective assistance of counsel, a constructive denial of counsel, nor an unconstitutional failure to grant a continuance. *See Mitchell*, 560 N.W.2d at 607-08. The Michigan Supreme Court thus analyzed Mitchell's claims under the *Strickland v. Washington*, 466 U.S. 668 (1984), standard for ineffective assistance of counsel which requires deficient performance and a showing of prejudice, and it found that because Mitchell had not adequately developed a record at the *Ginther* hearing "regarding what Mr. Evelyn did or did not do, or whether Mr. Evelyn knew of the alleged eyewitnesses," there was "no factual basis for a conclusion that counsel's performance was constitutionally deficient." *Mitchell*, 560 N.W.2d at 609. The court concluded that "[a]n inference of constitutional ineffectiveness cannot be established on the basis of the 'circumstance' of counsel's thirty-day suspension during seven months of representation, without any inquiry into the conduct of the trial or any record being developed regarding counsel's actual preparedness and its effect on the result." *Id.* at 613.

Two Justices dissented, finding that Evelyn's performance was "per se" ineffective under *United States v. Cronic*, 466 U.S. 648 (1984), and *Geders v. United States*, 425 U.S. 80 (1976), because of a confluence of factors including Evelyn's suspension, which rendered him completely unavailable for thirty days during the critical stage of pre-trial investigation; the fact that Evelyn failed to hold a private meeting with the defendant during the seven-month period of his representation; and the gravity of the first-degree murder charge against Mitchell. *See Mitchell*, 560 N.W.2d at 621-22. The dissent concluded that the surrounding circumstances made it so unlikely that any lawyer could provide effective

assistance of counsel that Mitchell was constructively denied counsel.[2]

On March 25, 1998, Mitchell filed a petition for habeas corpus relief with the district court under 28 U.S.C. § 2254, asserting that he was denied his right to the effective assistance of counsel. The district court granted Mitchell's petition, and on July 12, 2001, we affirmed, reasoning that because Mitchell was constructively denied the assistance of counsel during the critical pre-trial period, the state courts' refusal to grant him relief was an unreasonable application of *United States v. Cronic*, 466 U.S. 648 (1984). After the Supreme Court decided *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843 (2002), which further explicated the line between claims based on *United States v. Cronic* and claims based on *Strickland v. Washington*, 466 U.S. 668 (1984), the Court vacated our decision in this case and remanded the case to us for further consideration in light of *Bell*. *Mason v. Mitchell*, __ U.S. __, 122 S. Ct. 2354 (2002). Upon careful consideration, we affirm the district court.

## II. ANALYSIS

### A. Standard of Review

Whether the district court properly granted the writ of habeas corpus is a question of law that we review de novo. *Doan v. Brigano*, 237 F.3d 722, 729 (6th Cir. 2001). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), which amended 28 U.S.C. § 2254, applies to all habeas

---

[2]The dissent noted that while "Evelyn might be a very gifted trial lawyer who knows full well the 'rules of the game,' this cannot excuse the total lack of preparation. Defending a person in a first-degree murder trial is not a game. Effective representation must mean more than showing up and giving a good performance. If truth seeking is to play some role in our criminal justice system, defense attorneys must exert at least some effort to explore the truth so that, if there is exculpatory evidence available in favor of their client, they can present it." *Mitchell*, 560 N.W.2d at 622 n.7.

petitions filed after April 24, 1996, the effective date of the Act. Because Mitchell's petition for habeas was filed after the effective date, AEDPA governs our review of this case.

Pursuant to AEDPA, a writ of habeas corpus may "not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The federal court must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

The question whether Mitchell was deprived of his right to effective assistance of counsel is a mixed question of law and fact. *Olden v. United States*, 224 F.3d 561, 565 (6th Cir. 2000). In a habeas case, we apply the "unreasonable application" prong of § 2254(d)(1) to a mixed question of law and fact. *Harpster v. Ohio*, 128 F.3d 322, 327 (6th Cir. 1997). In *Terry Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court elaborated upon the independent meaning conveyed by the "contrary to" and "unreasonable application of" clauses of the statute, as well as the distinct analysis to be performed under each clause. *Williams*, 529 U.S. at 410. According to the Court, a federal habeas court may find that the state court decision resulted in an "unreasonable application of" clearly established Federal law if "the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The Supreme Court cautioned that "a federal habeas court may not issue the

writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. The *Williams* decision also clarified that in our review of the state court's judgment, we may only look to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision to determine whether the state court unreasonably applied clearly established federal law. *See id.* at 412.

With these guidelines in mind, we turn to the question whether the district court properly granted Mitchell's petition for habeas corpus relief.

**B. Procedural Default**

As we did in our first opinion, we must address the Warden's initial argument that the district court erred by evaluating Mitchell's ineffective assistance of trial counsel claim instead of rejecting it as procedurally defaulted in state court. Warden Mason asserts that under Michigan law, when the effectiveness of a lawyer's representation is challenged, the lawyer must be called as a witness to testify at the *Ginther* hearing in order to create the proper evidentiary record. According to the Warden, Mitchell's failure to call his trial counsel at the *Ginther* hearing violated this state procedural rule. Therefore, Mitchell was unable to establish the necessary factual record from which that court could evaluate his claim. The Warden asserts that the Michigan Supreme Court relied on this state procedural rule to deny Mitchell relief.

When the state argues that a petitioner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review is barred unless the petitioner can show cause for the default and actual prejudice as a result of the alleged violation of federal law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). For the doctrine of procedural default to bar federal review, however, a firmly established and regularly followed state procedural

rule applicable to the petitioner's claim must exist, and the petitioner must have failed to comply with that rule. *See Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (explaining that an adequate and independent state procedural bar to the consideration of "constitutional claims must have been 'firmly established and regularly followed' by the time as of which it is to be applied") (citing *James v. Kentucky*, 466 U.S. 341, 348 (1984)).   We have jurisdiction to review the petitioner's federal claim unless the last state court from which the petitioner sought review clearly and expressly invoked a firmly established state procedural rule as a basis for its decision to reject review of the petitioner's federal claim. *Coleman*, 501 U.S. at 735.

Based on our review of Michigan case law, we conclude that there was no well-established state procedural rule as of the time that Mitchell's claim was reviewed that barred appellate review in the absence of trial counsel's testimony at a *Ginther* hearing.  At oral argument before this court, counsel for the Warden first pointed us to this very case, *People v. Mitchell*, 560 N.W.2d 600 (Mich. 1997), as evidence that Michigan has a firmly established procedural rule requiring the defendant to call defense counsel at a *Ginther* hearing or risk procedurally defaulting the claim.  Of course, citing to the very case under review is useless because it is the Warden's burden to demonstrate that the rule was *already* firmly established and regularly followed as of the time the state court invoked the rule.   *See Ford*, 498 U.S. at 423-24. Counsel for the Warden then cited to a one-paragraph order in another case granting a *Ginther* hearing, *People v. Williams*, 391 Mich. 832 (1974), to support his contention. This single, one-paragraph order is utterly insufficient to demonstrate the existence of a state procedural rule so "firmly established and regularly followed" that it may bar a petitioner's federal constitutional claim on collateral review. *Ford*, 498 U.S. at 423-24 (quoting *James*, 466 U.S. at 348).

When there has been no motion for a new trial or a *Ginther* hearing, the case law reveals that a Michigan reviewing court *will* consider claims of ineffective assistance of counsel but

will be forced to limit itself to examining the trial record for errors, as no other record has been developed.[3]  Thus, while *Ginther* and its progeny indicate that it is crucial to develop an adequate record of trial counsel's failures if petitioner's claim is to succeed, we believe that those Michigan courts that have rejected ineffective assistance of counsel claims have done so on the merits of the claim and not due to a procedural default.[4]  Because we conclude that there was no firmly established and regularly followed state procedural rule to bar Mitchell's ineffective assistance claim when the Michigan Supreme Court reviewed this case, the district court did not err in considering the claim and we need not engage in a cause-and-prejudice analysis before reaching the substance of Mitchell's claim.

## C.  Application of AEDPA

The threshold question under AEDPA is whether Mitchell seeks to apply a rule of law that was clearly established at the time his state court conviction became final. *Williams*, 529 U.S. at 390.  There is no doubt that the rule of law that Mitchell seeks to apply — the "per se" ineffective assistance of counsel rule — was clearly established by the Supreme

---

[3] *See, e.g., People v. Snider*, 608 N.W.2d 502, 517 (Mich. Ct. App. 2000) (holding that where defendant has failed to move for a new trial or an evidentiary hearing, his claim for ineffective assistance of counsel is "largely forfeited" because review is limited to the existing record); *People v. Williams*, 566 N.W.2d 649, 652 (Mich. Ct. App. 1997) ("Because there was no *Ginther* hearing, our review is limited to mistakes apparent on the record."); *People v. Dixon*, 552 N.W.2d 663, 669 (Mich. Ct. App. 1996) ("Defendant failed to created a testimonial record in the trial court with regard to his claims of ineffective assistance.  This failure forecloses appellate review unless the record contains sufficient detail to support defendant's claims.").

[4] In this case, the Michigan Supreme Court determined that, because Evelyn was not called to testify at the *Ginther* hearing, it had "no factual basis for a conclusion that counsel's performance was constitutionally deficient and undermines confidence in the reliability of the verdict." *Mitchell*, 560 N.W.2d at 609.  This is a decision on the merits of Mitchell's claims as presented to the court.

Court in *United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Cronic*, 466 U.S. at 659 n.25. In other words, when counsel is totally absent during a critical stage of the proceedings, prejudice must be presumed. In *Williams*, the Supreme Court confirmed the vitality of this "per se" approach, noting that while the *Strickland v. Washington*, 488 U.S. 668 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice, provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." *Williams*, 529 U.S. at 391 (citing *Strickland*, 466 U.S. at 692). We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel. *Olden*, 224 F.3d at 568 (prejudice is presumed when counsel is absent during prosecution's presentation of evidence that implicates defendant because such absence occurred during "critical stage" of trial). Thus, we easily reach the conclusion that it was clearly established by the Supreme Court, as of the time that Mitchell's case was decided in state court, that the "complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice." *Roe v. Flores-Ortega*, 528 U.S. 470, 483 (2000) (citing *Cronic,* 488 U.S. at 659).

Because there is clearly established law applicable to Mitchell's claim, the next question we must address is whether the Michigan Supreme Court's decision rejecting Mitchell's ineffective assistance claim was "an unreasonable application of" that established law or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). The Warden correctly argues that the district court failed to review the Michigan Supreme Court findings under the deferential standard of review mandated by AEDPA. The district court's order did not determine whether

the Michigan Supreme Court's analysis was objectively unreasonable; instead, it essentially reviewed Mitchell's claims de novo. We must now, therefore, conduct the appropriate review of the Michigan Supreme Court's decision.

## D. Mitchell's Ineffective Assistance of Counsel Claim

Although the Michigan Supreme Court properly acknowledged Supreme Court precedent by noting that "[t]he right to counsel extends to representation during any 'critical stage' of the proceedings," it then concluded that the right to counsel "does not require the state to provide the defendant with unlimited access to the attorney during the trial" and that "[a] fortiori, it does not guarantee a defendant 'a private in-depth interview' during pretrial in the place of the defendant's choosing." *Mitchell*, 560 N.W.2d at 605 n.9 (internal citations omitted).

Framing this case as one about "allegations of inadequate preparation," the Michigan Supreme Court declined to apply a per se prejudice analysis to Mitchell's claim after rejecting the suggestion that Mitchell's case presented circumstances that made it unlikely that any lawyer could provide effective representation, that Mitchell was constructively denied counsel, or that he was denied counsel combined with a failure to grant a continuance. *See id.* at 607. The Michigan Supreme Court rejected these theories in inverse order. Relying on *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983), for the proposition that "[n]ot every restriction on counsel's . . . opportunity to investigate . . . or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel," the Michigan Supreme Court determined that it was not error for the state trial court to deny Mitchell's request for a continuance so that he could consult with his lawyer prior to trial. *Mitchell*, 560 N.W.2d at 607 (quoting *Morris*, 461 U.S. at 11-12). Pointing to *United States v. Cronic*, 466 U.S. 648 (1984), the Michigan Supreme Court then held that Evelyn's thirty-day suspension did not constitute a constructive denial of counsel. Moreover, the Michigan Supreme Court declared,

a claim of ineffective assistance of counsel "stemming from a thirty-day suspension coupled with six-months time for preparation" does not, pursuant to *Cronic,* create a circumstance making it so unlikely that any lawyer could provide the defendant with constitutionally effective assistance. *See Mitchell*, 560 N.W.2d at 609.

The Michigan Supreme Court then evaluated Evelyn's performance to determine whether it was deficient under the familiar two-part *Strickland* standard and concluded it was not. *Id.* The court first stated that there was no factual basis for concluding that Evelyn's performance was constitutionally inadequate. *See id.* at 609-10. The court then performed the first part of the *Strickland* analysis based on the record before it and determined that Evelyn's performance met constitutional muster. *See id.* at 610-11.

After a thorough review of the record, we are convinced that the undisputed amount of time that Evelyn spent with Mitchell prior to jury selection and the start of trial — approximately six minutes spanning three separate meetings in the bullpen, when viewed in light of Evelyn's month-long suspension from practice immediately prior to trial — constituted a complete denial of counsel at a critical stage of the proceedings. The Michigan Supreme Court's evaluation of Mitchell's ineffective assistance claim under the *Cronic* standard for per se prejudice reflects a misunderstanding and misapplication of that Supreme Court precedent. We conclude that, in insisting on evaluating Mitchell's claim under the *Strickland* standard for ineffective assistance of counsel, the Michigan Supreme Court erroneously and unreasonably applied clearly established Supreme Court law set forth in *Cronic*.

## E. Constructive Denial of Counsel

In *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843 (2002), the Supreme Court defined the differences between claims governed by *Strickland* and claims governed by *Cronic*. If a claim is governed by *Strickland*, a defendant must typically demonstrate that specific errors made by trial counsel affected

the ability of the defendant to receive a fair trial. If a claim is governed by *Cronic*, however, the defendant need not demonstrate any prejudice resulting from the lack of effective counsel; in some cases, the Sixth Amendment violations are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658. Three types of cases warrant *Cronic*'s presumption-of-prejudice analysis. The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" *Bell*, 122 S. Ct. at 1851 (quoting *Cronic*, 466 U.S. at 659). The second is when counsel "'entirely fails to subject the prosecution's case to meaningful adversarial testing.'" *Id.* (quoting *Cronic*, 466 U.S. at 659). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance. *Id.*

Because Mitchell was denied the presence of counsel during the critical pre-trial stage, Mitchell's claim should be reviewed under *Cronic*. On its way to analyzing Mitchell's claim under *Strickland*, the Michigan Supreme Court erred by focusing solely on the thirty-day period immediately preceding trial in which Mitchell's counsel was suspended from practicing law. Framing the issue as entirely an issue of preparation time, the state court interpreted Mitchell's challenge as a challenge to one particular aspect of the defense and analyzed the claim under *Strickland*. If this thirty-day period were the only issue, it might have been proper to apply the *Strickland* analysis, for as *Bell* notes, counsel's failure in particular instances is evaluated under *Strickland*. *See Bell*, 122 S. Ct. at 1851-52. However, the absence of counsel extended throughout the pre-trial period; not only was Mitchell's counsel suspended from the practice of law for the month immediately preceding trial, but Mitchell's counsel also met with Mitchell for no more than six minutes over the seven-month period before trial, and the trial court repeatedly ignored Mitchell's entreaties for counsel who would properly prepare a defense.

In analyzing this case under § 2254, we note that this is one of those cases in which, as the *Williams* Court described, it is "difficult to distinguish a decision involving an unreasonable extension of a legal principle," which would warrant relief under § 2254's "unreasonable application" provision, "from a decision that arrives at a conclusion opposite to that reached by this Court on a question of law," which would warrant relief under § 2254's "contrary to" provision. *See Williams*, 529 U.S. at 408 (quotation omitted). That is, despite the Supreme Court's instruction that questions of law are governed by the "contrary to" provision and questions involving the application of law to facts are governed by the "unreasonable application" provision, it is unclear whether a case such as this one is better categorized as involving an unreasonable extension of *Strickland* to the facts at hand or an incorrect choice of law in refusing to apply *Cronic*. *See* Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum. L. Rev. 229, 233-35 (1985) (describing questions of law, questions of fact, and mixed questions of the application of law to fact as not admitting of clear distinctions). Regardless, as the Court did in *Williams*, we decline to resolve this question, for, as in *Williams*, the state court's decision is both contrary to and involves an unreasonable application of Supreme Court precedent. *Williams*, 529 U.S. at 391.

In *Bell*, the Supreme Court identified "critical stage[s]" by looking to previous cases in which it had so characterized various stages of criminal proceedings. By this reasoning, the pre-trial period is indeed a critical stage, the denial of counsel during which supports a *Cronic* analysis. Several of the Supreme Court's cases demonstrate that the period between appointment of counsel and the start of trial is indeed a "critical stage" for Sixth Amendment purposes. The Supreme Court in *Powell v. Alabama*, 287 U.S. 45, 57 (1932), described the pre-trial period as "perhaps the most critical period of the proceedings . . . that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation were vitally important." The Court ruled that a defendant must be provided counsel at "every step in the proceedings

against him," which the *Powell* ruling suggests includes the pre-trial period at issue here. *Id.* at 69.

*Bell* confirms that the "critical stage[s]" at which counsel must be present are not limited to formal appearances before a judge. That is, although a defendant may not have a right to consult with counsel while the defendant is testifying, "[h]e has an absolute right to such consultation before he begins to testify." *Perry v. Leeke*, 488 U.S. 272, 281 (1989). The *Bell* Court cites *Geders v. United States*, 425 U.S. 80, 91 (1976), in which a defendant was not allowed to access counsel during a seventeen-hour overnight recess, as an example of the denial of counsel at a critical stage for *Cronic* purposes. *See Bell*, 122 S. Ct. at 1851 n.3. The recess was important, according to *Geders*, because "[s]uch recesses are often times of intensive work, with tactical decisions to be made and strategies to be reviewed. The lawyer may need to obtain from his client information made relevant by the day's testimony, or he may need to pursue inquiry along lines not fully explored earlier." *Geders*, 425 U.S. at 88. *Bell*'s reliance on both *Powell*, *see Bell*, 122 S. Ct. at 1851, and *Geders*, *see id.* at 1851 n.3, confirms that "a critical stage" includes pre-trial preparation.

The pre-trial period constitutes a "critical period" because it encompasses counsel's constitutionally imposed duty to investigate the case. In *Strickland*, the Supreme Court explicitly found that trial counsel has a "duty to investigate" and that to discharge that duty, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The Supreme Court also recognized that without pre-trial consultation with the defendant, trial counsel cannot fulfill his or her duty to investigate. The Court stated that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Id.*

The Court went on to emphasize further the significance of the defendant's input into trial counsel's investigation:

> In particular, what investigation decisions are reasonable depends critically on such information [provided by defendant]. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Id.* Because the Supreme Court has repeatedly made clear that there is a duty incumbent on trial counsel to conduct pre-trial investigation, it necessarily follows that trial counsel cannot discharge this duty if he or she fails to consult with his or her client.[5]

Unlike the defense counsel in *Morris v. Slappy*, 461 U.S. 1 (1983), and *Dick v. Scroggy*, 882 F.2d 192 (6th Cir. 1989), defense counsel here utterly failed his client during the critical

---

[5] This is not, as counsel for the Warden claims, a new rule of law. As our discussion of Supreme Court precedent indicates, the Supreme Court has considered the pre-trial period to be a critical stage of the proceedings since at least 1932, when it handed down *Powell*. A new rule of law "breaks new ground or imposes a new obligation" on the states or the federal government. Alternatively, a court announces a new rule of law "if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Teague v. Lane*, 489 U.S. 288, 300-01 (1989). It cannot seriously be argued that defense counsel's obligation to consult with his client at least once is a new or novel obligation being imposed on the government or that the Supreme Court's cases in *Powell*, *Strickland*, and *Cronic* do not compel this result.

pre-trial period. In *Slappy*, the Supreme Court rejected an ineffective assistance claim based on a public defender who became ill and was replaced prior to trial. The Court in *Slappy* pointed out that the replacement counsel had read all of the relevant transcripts, obtained and reviewed all of the relevant materials, and had met with the defendant several times for extended interviews. *See Slappy*, 461 U.S. at 5-7. Indeed, counsel in *Slappy* repeatedly assured the trial court that he was prepared to try the case based on his conferences with the defendant and the study he had made of the investigation. *Id.* at 6-7. Similarly, in *Scroggy*, the defendant's ineffective assistance claim was rejected because counsel had, in fact, interviewed the defendant in a thirty- to forty-five-minute meeting. *See Scroggy*, 882 F.2d at 197. Neither of these cases gives guidance here, however, because although it is true that "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel," *Slappy*, 461 U.S. at 11, in this case, no effort to consult with the client was made.

The Sixth Amendment guarantees more than a pro forma encounter between the accused and his counsel, and six minutes of consultations spread over three meetings do not satisfy its requirements. "Assistance begins with the appointment of counsel, it does not end there." *Cronic*, 466 U.S. at 654 n.11. When counsel is appointed but never consults with his client and is suspended from practicing law for the month preceding trial, and the court acquiesces in this constructive denial of counsel by ignoring the defendant's repeated requests for assistance, *Cronic* governs. The Michigan Supreme Court's decision was both contrary to and an unreasonable application of Supreme Court precedent. *See Williams*, 529 U.S. at 407.

### F. Mitchell's Pre-Trial Contact With His Attorney

Finally, the Warden argues that the district court based its decisions on factual findings specifically rejected by the state courts in violation of § 2254(e)(1), which requires a habeas

court to presume that all factual findings made by a state court are correct absent clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1). However, the presumption of correctness that protects state court findings of fact does not extend to the Michigan Supreme Court's legal conclusion that Mitchell was not without counsel at a critical stage of the proceedings. Thus, the Michigan Supreme Court's pronouncement that "[t]here is no factual basis for a conclusion that counsel's performance was constitutionally deficient," *Mitchell*, 560 N.W.2d at 609, is not due the deference accorded to a pure finding of fact, as this statement encompasses a mixed question of law and fact, which we review de novo. Indeed, our conclusion is dictated by our application of law to facts in the state court record, which is properly governed by § 2254(d)(1).

Although the Michigan Supreme Court stated that "[n]o record was made regarding what Mr. Evelyn did or did not do," *Mitchell*, 560 N.W.2d at 609, that court noted that Mitchell "wrote six letters to the trial judge, the chief judge and others requesting removal of counsel," *id.* at 603. These letters, which were part of the record before the Michigan Supreme Court, document Mitchell's unsuccessful efforts to contact his attorney. For example, on February 8, 1989, Mitchell wrote to the court:

> I have been locked up for 5 months and not once have my lawyer took time out to talk to me....3 times after I went to court my lawyer has told me that he would be over to talk to me, but never did.....Every since my second month of being incarcerated I have had my mother go over to his office concerning an evidentiary hearing, she have been at his office many times, she has wrote many letters but he has never replied to her....I know I'm charged for something I haven't done, but I know that if I can't express to Gerald K. Evelyn what happen on the night this incentdent occurd he will not know the best stradagy of what and how to fight this case....For 5 months I have waited patiently, I have tryed every way I can to get him to talk to me, I am tired of

> being in the dark and knowing he's in the dark....So your honor Please take him off my case because he's not representing me at all.

J.A. at 108a - 108b (Handwritten Letter from Mitchell). No one responded to his letters until eleven days before the start of the trial.

On April 27, 1989, the trial judge convened a hearing to discuss Mitchell's motion for appointment of new counsel. At the hearing, Mitchell informed the trial court that he had received a letter stating that Evelyn had been suspended from the practice of law; it does not appear that the trial court was even aware that Evelyn had been suspended. Evelyn did not attend this hearing, presumably because he was suspended from practice at this point. The trial judge postponed a decision on Mitchell's motion until Evelyn was able to be present.

On May 9, 1989, the second day of jury selection, the trial court revisited the issue of Mitchell's request for new counsel. Evelyn was present at this time. At this hearing, Mitchell stated to the court:

> Well, from the very beginning, you know, Mr. Evelyn promised to talk with me. He has failed to talk with me on every occasion that he promised. He has failed to make any motions for me, and he's failed to talk with my mother, which she has written many letters and calls, and went to his office, also, left word with his secretary. And he also showed up an hour late on my final conference and by him letting me know yesterday that he was going to come over and talk with me and by him failing to do that, I just, I just feel it's just incompetent.

J.A. at 174. When the court asked: "[n]ow, in those letters, it was a question of his not keeping appointments, or seeing you as many times as you'd like to be seen in the jail; is that right?" Mitchell then replied: "Yes. *Never seeing me at all.*" J.A. at 174 (emphasis added). He further asserted that "[t]he only time I meet him is in the courtroom, or brief discussion

in the bullpen with plenty of other people in the bullpen. I just don't see how courts can say that that's true fairness." J.A. at 187. Mitchell, who is hard of hearing, also claimed that because he was not wearing his hearing aid in the bullpen, he could not hear half of what his lawyer was saying to him. J.A. at 184. At one point, Mitchell asked, "[H]ow can I make it all the way to trial when Mr. Evelyn has never heard my true side of the story." J.A. at 185-86.

Evelyn testified at length during this hearing. While he made the argument that he had delivered discovery materials to Mitchell and was in the process of working out a deal with the prosecutor to suppress certain evidence on the eve of trial, he never disputed the substance of Mitchell's allegations. At one point he did claim, "I talked to him [Mitchell] prior to the [pre-trial] examination, your Honor. He's leaving one visit out at least. We have talked on numerous occasions." J.A. at 186. This non-responsive statement, however, is conclusive only of the fact that he and Mitchell had met in the courtroom bullpen before court appearances, which Mitchell acknowledged. Notably, when presented with the opportunity to clear the record before the trial court judge, Evelyn never disputed the substance of Mitchell's assertions regarding the content of their communications.

At the *Ginther* hearing, Mitchell also testified about the nature of his contact with Evelyn prior to the trial. His testimony at this hearing is consistent with the substance of the letter he wrote to the trial court as well as his testimony before the trial court during jury selection.

Q: Who was your attorney for this case?

A: Attorney Gerald Evelyn.

Q: Do you recall when you saw this person in relation to the preliminary examination?

A: I recall seeing him sitting in the courtroom, the first time I met him.

Q: At the preliminary examination?

A: Yes.

Q: And, how much contact with him did you have before the preliminary examination?

A: None.

***

Q: When did you next see your attorney?

A: Well, I would see him in the bullpen behind the courtroom, maybe about three times — three different proceedings.

Q: And, those were later proceedings in Recorder's Court?

A: Yes.

Q: And, roughly, would you say how much contact did you have with him before the court proceedings?

A: *One or two minutes*.

***

Q: Did you see Mr. Evelyn at the Wayne County Jail before your trial in this case?

A: No, I never did.

Q: When was the first time you saw him in the jail, if at all?

A: The second date — I mean the first day of picking out the jury.

***

Q:  Before your trial started, in the weeks or months leading up to it, did you contact, or attempt to contact your attorney?

A:  Yes, I did.  I wrote him letters.  They wouldn't accept telephone calls.

J.A. at 151-53 (emphasis added).

The fact that Mitchell's counsel was suspended from the practice of law for the thirty days prior to trial does not decide this case, but it does contribute to the weight of the evidence that demonstrates that there was no consultation between Mitchell and his attorney prior to trial.  The Michigan Supreme Court found that Mitchell was never unrepresented during any critical stage of the proceedings.  According to that court, because Evelyn's law partner assumed responsibility for Evelyn's cases during his suspension, "there was no period of time when the defendant was not represented." *Mitchell*, 560 N.W.2d at 609 n.15.  The Michigan Supreme Court's presumption that Mitchell was continuously represented is directly contradicted by the record.  In a letter sent to Mitchell on April 10, 1989 informing him of his suspension, Evelyn advised Mitchell: "You may wish to seek legal advice elsewhere and, in the event you choose to do so, you may either pick-up your file or have your new attorney pick-up your file.  You may, should you choose to do so, have your case maintained by our law firm; *in which case, you must expressly indicate same in writing*."  J.A. at 108c (emphasis added).  The letter then states: "[S]hould you have any questions or concerns, please do not hesitate to contact Myzell Sowell," Evelyn's law partner.  *Id.*  The record does not indicate that Mitchell retained Evelyn's law partner, nor does it indicate that he in any way consented to a substitution in counsel.  Moreover, we note that no counsel appeared on Mitchell's behalf at the April 11, 1989 hearing before the trial court, which was conducted during Evelyn's suspension, on Mitchell's motion for new counsel.  Thus, we conclude that, despite the Michigan Supreme Court's finding, there is clear

and convincing evidence that Mitchell was completely unrepresented for the last thirty days prior to his trial.

The Michigan Supreme Court held that, even if it were to find the defendant and his mother credible and assume that Evelyn never contacted witnesses and only met with the defendant three times, it would not find a denial of counsel at a critical stage.  *Mitchell*, 560 N.W.2d at 609 n.15.  Instead, the Michigan Supreme Court found that the allegations of trial counsel's deficient performance would have to meet the *Strickland* standard of deficient performance and prejudice. *Strickland*, however, applies great deference to decisions by defense attorneys out of concern that a rigid set of guidelines or rules would "interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 689.  The defendant bears the burden of proving counsel's ineffectiveness out of deference for counsel's decisions and trial strategy.  *See id.*  The illogic of applying *Strickland* to these facts is manifest in that there are no conceivable tactical or strategic reasons for defense counsel to fail to consult with a client prior to trial.  Such a meeting is vital if counsel is competently to develop a defense.  If counsel does not meet with his client for more than two minutes at a time, the defendant is unable to confide truthfully in his lawyer and counsel will not know, for example, which investigative leads to pursue, whether there are witnesses for the defense, or what kind of alibi the defendant may have.[6]

In *Cronic*, the Supreme Court delineated those few exceptional circumstances that are so likely to prejudice the

---

[6] Defense counsel's failure to speak with his client also violates several standards articulated in the ABA Standards for Criminal Justice. For example, the Duty to Keep Client Informed Standard states, "(a) Defense counsel should keep the client informed of the developments in the case and the progress of preparing the defense and should promptly comply with reasonable requests for information" and "(b) Defense counsel should explain developments in the case to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." ABA Standards for Criminal Justice 4-3.8 (3d ed. 1993).

defendant that a reviewing court need not examine the consequences of the lawyer's conduct; one of these circumstances is the complete denial of counsel to a criminal defendant at a critical stage of the proceedings. *Cronic*, 466 U.S. at 659. In this case, we have demonstrated that, according to Supreme Court precedent, we must consider the pre-trial period "critical" for purposes of the Sixth Amendment. Although Mitchell alleged that his counsel's performance during trial was inadequate, he also alleged that his counsel was utterly absent during the seven-month period prior to trial. Because Mitchell's latter claim alleges his counsel's total absence during a critical period, the Michigan Supreme Court should have applied *Cronic*, rather than *Strickland*, to his claim.[7]

### III. CONCLUSION

In light of the Michigan Supreme Court's assumption that the pre-trial period, during which investigation and consultation with the defendant must occur, was not a "critical stage" of the proceedings, the Michigan Supreme Court unreasonably applied clearly established Supreme Court precedent to the facts of this case. *See* 28 U.S.C. § 2254(d)(1). The Supreme Court has long recognized that there is a duty to investigate before trial and that, by failing to consult with the defendant, counsel cannot perform this duty during a critical stage. The undisputed record evidence demonstrates that Mitchell's counsel never consulted with him and that he was completely unrepresented during the entire month prior to his trial. These are clearly circumstances so likely to prejudice the accused that the cost

---

[7] Finally, although the district court did not comment upon Mitchell's claim that his appellate counsel was constitutionally ineffective, we note that, were we to accept the Warden's argument that a defendant forfeits his ineffective assistance of counsel claim if he fails to call his trial attorney as a witness at the *Ginther* hearing, we do not believe that the appellate counsel's failure to call the trial attorney could be considered reasonable strategy on the facts of this case. It is not strategy for an appellate attorney to ask for a *Ginther* hearing and then to conduct it in such a way as to preclude relief for the defendant.

of litigating their effect in a particular case is unjustified. Therefore, the Michigan Supreme Court erred by rejecting the per se prejudice analysis and insisting on evaluating Mitchell's claim through the lens of *Strickland*. For the foregoing reasons, we **AFFIRM** the district court's provisional grant of the writ of habeas corpus.

———————

**DISSENT**

———————

CARR, District Judge, dissenting.  I remain unable to concur in the majority's judgment for the reasons previously expressed in my original dissent. 257 F.3d 554, 574-80. I continue to be of the view that this case, particularly in light of *Bell v. Cone*, 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914, (2002), is governed by the cause and prejudice standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), rather than the *per se* standard of *U.S. v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). While, unquestionably, the petitioner's attorney failed to consult adequately with the petitioner prior to trial, the record does not support the conclusion that he, as required to grant relief under *Bell* and *Cronic*, "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." 466 U.S. at 659, 104 S.Ct. 2039.

I also remain persuaded that we are bound to abide by the decision of another panel in a case presenting facts that are, in my view, substantially indistinguishable from the facts of this case. *Dick v. Scroggy*, 882 F.2d 192, 197 (6th Cir.1989).

Though my views on the foregoing have been expressed amply in my original dissent, and will not be repeated here, I will repeat the following observation from that opinion, in which I fault the trial court for its inexplicable failure

to have taken the time before commencing a first degree murder trial to inquire effectively into the circumstances, and to have ensured that the petitioner's counsel was reasonably well prepared to defend his client. The trial court's failure, in the face of the petitioner's unanswered claims of lack of contact with his attorney and the lawyer's eve-of-trial suspension from practice, to grant a short continuance is, in a word, incomprehensible.  The compulsion to maintain a tidy docket should never, as it

so clearly did here, place fundamental rights at risk. Would a week's delay have really mattered?

The message of this case is not that federal courts are quick to intervene into state proceedings; the message is, rather, that the state trial court in this case could and should have done a better job of upholding the Constitution. Had it taken but a few moments to consider the petitioner's complaints meaningfully, or had it postponed the trial for a brief period to make certain that Evelyn was truly ready for trial, this case would not be here.  The time the trial court may have saved has led to a great and otherwise unnecessary expenditure of time on the part of the Michigan courts of review, the district court, and this court.

257 F.3d at 580.

Respectfully, I dissent.