*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROEUR VAN,

*Petitioner-Appellant,*

*v.*

No. 04-2277

KURT JONES, Warden,

*Respondent-Appellee.*

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 01-00370—Richard A. Enslen, District Judge.

Argued: March 6, 2006

Decided and Filed: January 16, 2007

Before: BOGGS, Chief Judge; and MOORE and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Mary Beth Young, JONES DAY, Columbus, Ohio, for Appellant. William C. Campbell, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Mary Beth Young, Holly H. Saigo, JONES DAY, Columbus, Ohio, for Appellant. William C. Campbell, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

BOGGS, C. J., delivered the opinion of the court. COOK, J. (p. 22), delivered a separate concurring opinion. MOORE, J. (pp. 23-24), delivered a separate dissenting opinion.

---

## OPINION

---

BOGGS, Chief Judge. Is a Michigan defendant's consolidation hearing a critical stage of the criminal proceeding against him? And, if so, what results from his counsel's total absence from that hearing? These questions are the nub of this case.

Roeur Van appeals the district court's denial of his petition for a writ of habeas corpus. The court issued a Certificate of Appealability with respect to whether Van's Sixth Amendment rights to counsel and a fair trial were violated when the state court consolidated his criminal trial with that of his co-defendants at a hearing ("consolidation hearing") at which Van's attorney was not present.

1

This is a difficult case presenting a question of first impression for a United States appellate court.[1]  We affirm the judgment of the district court that a Michigan consolidation hearing is not a critical stage and that the total absence of counsel at such a hearing does not require that a writ of habeas corpus issue.

## I

Where a claim on habeas appeal has not been addressed by the state courts, federal courts review it *de novo*. *Wiggins v. Smith*, 539 U.S. 510 (2003).  *See also Maples v. Stegall*, 340 F.3d 433, 436-37 (6th Cir. 2003), *McKenzie v. Smith*, 326 F.3d 721, 726-27 (6th Cir. 2003).

This court reviews *de novo* mixed questions of law and fact such as issues of ineffectiveness of counsel and the harm that arises from an alleged constitutional violation.  *See, e.g.*, *Mallett v. United States*, 334 F.3d 491, 497 (6th Cir. 2003); *Calvert v. Wilson*, 288 F.3d 823, 833 (6th Cir. 2002).

## II

Van was convicted on March 20, 1997, in a Michigan court of assault with the intent to commit murder.[2]  He was sentenced on April 21, 1997, to a prison term of fifteen to thirty years.

Van was a confederate of Vanna Ket.  They are both Asian-Americans.  Vanna and his wife Jamie Ket were married in April 1994 and separated in January 1996.  Jamie then began dating Maurice Hawkins, who is African-American.  Vanna knew about Jamie's new paramour.  Vanna began dating Alisha Dornak, Hawkins's ex-girlfriend and the mother of Hawkins's child.

Jamie, Hawkins, and several friends, including James Evans, Dontrell Brothers, Corey Shields, and Dimitrius Brown, all African-American, congregated in Jamie's trailer on October 19, 1996, to socialize.  At 1:30 in the morning on October 20, 1996, the party heard a knock on the door, and Jamie answered.  Vanna entered and yelled at her and called her unattractive names.  He informed the assembled group "if anybody wants to trip, we can trip."  Evans replied "if you want to trip, we could take it there, but I think it's time for you to leave."  Vanna decided "fuck this shit" and left.

Roughly 30 to 45 minutes later, Vanna returned with several friends.  Someone kicked in the door of the residence, and Vanna entered with Samean Rouen, known as "Billy."  These two men moved into the mobile home and declared "[w]hat's up, niggers?  What's up now?"  Rouen carried a wooden instrument, possibly a 2" x 4".  Vanna had a gun tucked in the back of his pants waistband.  Jamie said "get that gun out of my house."  Vanna then drew his gun, cocked it, pointed it at Jamie's head six to twelve inches from her face, and said "[b]itch, I'll kill you."  He then pointed the gun at the others in the room.  Jamie's guests stayed seated throughout this period, except Brown, who was sleeping in another room.

It was roughly at this point that defendant Roeur Van, known as "Chino," entered the house.  Four others followed, all Asian-American, including a man known as Crew, but it is unclear in what

---

[1]As becomes apparent *infra*, a consolidation hearing may be viewed as a close cousin of a severance hearing. But no federal appeals court has considered the question whether a hearing on a motion to sever is a critical stage of a criminal proceeding, either.

[2]This was his second major run-in with the law.  In 1995, he was been convicted of Attempted Criminal Sexual Conduct in the 3rd Degree in the Ottawa County Court of Michigan.  This crime made him subject to additional sentencing in our case.

order they entered the room after Van. Van held a machete. He unsheathed it and said "You know me. I'm Chino. Where's Maurice?" According to Jamie's testimony, he then "went straight for Maurice." According to other testimony, Van actually approached Shields and Brothers, but Vanna redirected him by saying "no, get Maurice." Van swung the machete at Hawkins's throat. Dontrell blocked the blow with his hand. Brothers then placed his body on Hawkins to protect him from further attacks. Vanna said repeatedly "[g]et Maurice, get Maurice." Van swung the machete again and struck Hawkins's knee. He landed another blow to Hawkins's shin. Vanna then took the machete from Van and struck Hawkins in one hand and then the other hand. Two of Hawkins's fingers "were just hanging there" after one of Vanna's blows. Meanwhile, Roeun struck one guest with both the 2" x 4" and a gun, and he pointed a gun at two of the guests. The other members of the gang attacked the guests with a crowbar, a bat, and an object that appears to have been a metal pipe or similar instrument. Soon thereafter, fearing the arrival of the police, the attackers departed.

The defendant has properly exhausted his state court remedies. The Michigan Court of Appeals affirmed his conviction on January 19, 1999. His motion in the Michigan Circuit Court for relief from judgment was denied on February 15, 2000. The state court of appeals affirmed the denial on August 21, 2000. The Michigan Supreme Court denied leave to appeal on January 30, 2001.

Van filed a petition for a federal writ of habeas corpus on June 13, 2001. He made two claims: 1) insufficiency of the evidence and 2) violation of his Sixth Amendment rights through the holding of a pre-trial hearing in the absence of his attorney. The magistrate judge recommended denial of the petition, while acknowledging the absence of clear precedent on Van's second claim. The district court adopted the recommendation and denied the petition on September 21, 2004. It granted a certificate of appealability (CoA) on the second claim, however. Van then sought to appeal the denial of his petition; this court construed this effort as a request for a CoA. On April 5, 2005, this court, through the order of Judge Clay, denied Van's request for a CoA on the evidentiary claim and appointed counsel with respect to the claim arising from the absence of counsel at his pre-trial hearing.

### III

Four of the seven assailants who were seen at the trailer were arrested and charged: Van, Vanna, Rouen, and Phoey Svay. It is not clear from the record before this court what happened to the other three. Van was charged with assault with intent to commit murder. David Zessin was appointed to represent him. On December 30, 1996, the prosecution moved to consolidate the trials of the four defendants into one proceeding. The trial court held a hearing on the motion to consolidate on January 6, 1997. Zessin was notified but did not attend.

At the time of the consolidation hearing, Rouer Van was charged with one count of assault with intent to murder. Vanna Ket was charged with one count of assault with intent to murder, six counts of felonious assault with a dangerous weapon, one count of possession of a firearm during the commission of a felony, and one count of carrying a concealed weapon. Samean Rouen was charged with three counts of assault with intent to do great bodily harm, two counts of felonious assault with a dangerous weapon, and one count of possession of a firearm during the commission of a felony. Phoey Svay was charged with two counts of assault with intent to do great bodily harm.

The transcript from the consolidation hearing occupies eight pages. All four defendants were present. Each had been appointed his own lawyer. The lawyers for all the defendants but Van were present.

At the opening of the motion hearing, the prosecutor, Douglas L. Mesman, Chief Assistant Prosecuting Attorney in Grand Haven, Michigan, explained why he wanted to consolidate: "I believe

it's clear from my motion that this certainly was a matter in which all defendants participated at the same time." Vanna Ket and Samean Rouen were charged simultaneously and as co-defendants, but perhaps due to clerical error, their prosecution "files" were "set on two separate dates." Roeur Van "was not apprehended until . . . two or three weeks after the incident." Van and Svay were charged together as co-defendants. Mesman then explained "while they all committed different crimes to a certain extent, they certainly all participated in the same incident, the same occurrence on the same date, and, in fact, have been charged as co-defendants."

Joseph C. Legatz, Vanna Ket's lawyer, then presented himself to the court and said "[w]e have no problem with the consolidation." He then discussed his availability for possible trial dates.

David M. Hall, Samean Rouen's lawyer, introduced himself and said "[l]ikewise, we have no objection to the consolidation of all defenses and all charges. . . . I think there are common questions of law and fact here, and I have no objection to the principal motion." He also briefly discussed trial calendaring.

Donald L. Hann, Phoey Svay's lawyer, took his turn. Unlike the other two attorneys, he said "we do object to the consolidation." Most of his opening salvo warrants reproduction here, as it contains reasoning that cuts both in favor of and against Van's position in our case:

> Your Honor, . . . representing Phoey Svay, we do object to the consolidation, certainly as to an early trial date because we have not even received copies of the preliminary examination yet. When those are received, it's anticipated we will file a motion to quash the bindover as to the charge of great bodily harm . . . .
>
> If the Court grants those [the motion to quash the bindover], then we will be coming up with charges of felonious assault, at best, and would object to being linked in with attempted murder charges. I believe that those would lead over to the jury, that there would be so much confusion that Mr. Svay could not get an independent trial.
>
> We can understand our co-counsel's desire to throw them all together, but we do not believe, for Mr. Svay, that would be fair, and we think it would be difficult for the jury to sort out the various crimes, especially if there is a great difference of attempted murder down to felonious assault. So we object to the motion for consolidation.
>
> If the Court does grant the consolidation, we would ask the trial date be set several weeks or more away so we could file our motion on the charges against us.

Hann argued further that a statement made by Van to the police appeared to exculpate Roeun, and that, in a combined trial, should Van decline to testify, Roeun would not be able to use that exculpatory evidence.

Mesman replied to Hann's objection to consolidation. He reiterated that the four men "all took part at the same time in this offense." He said they were properly viewed as codefendants. He added that Hann's argument as to the exculpatory evidence did not, in his opinion,

> add[] up to a reason to sever these codefendants and force the prosecution to in fact try this case over at least two times. I think it's clear from the case law that unless there is a strong situation in which one codefendant is going to . . . have a totally different defense than

> another, I don't think it's appropriate to sever. And in this case, I
> think Mr. Hann's argument . . . falls short of having the Court sever
> these matters for trial.

The court then granted the motion to consolidate the four defendants' proceedings into one trial.

Though we take up Van's argument at greater length *infra*, we pause here to preview the relevance of Hann's remarks to our dispute. On the one hand, Hann's objection to the consolidation appears to militate in favor of Van's case. His reasoning, too, is redolent of that now presented by Van: Rouen did not want to be put in the same boat as more violent offenders, for fear that the jury might group them all together and, perhaps, be more inclined to convict him. On the other hand, we see from Hann's perspective how the groupings properly break out: accused attempted murderers to one side, and everybody else to the other. Van's charges might have been similar enough to Ket's that a jury might justifiably see the two of them, in a consolidated trial with no other defendants, as similarly situated, even though Van carried the burden of only a single charge and Ket faced eight. This pair of opposite possibilities casts a shadow over the entire matter before us.

At no time during the consolidation hearing did the court speak to Roeur Van or even acknowledge his presence in the courtroom.

## IV

Before the consolidated trial began, Rouen and Svay pleaded guilty. Rouen pleaded guilty to one count of assault with intent to commit great bodily harm and one count of felonious assault with a dangerous weapon. He was sentenced to prison terms of ten and four years, to run concurrently. Svay pleaded guilty to attempted assault with intent to do great bodily harm – he was apparently charged with a lesser crime as part of his plea agreement – and was sentenced to two to five years in boot camp.

Only Vanna Ket and Roeur Van faced the jury, which convicted Van of assault with intent to murder and Ket of all eight of his charges.

Following Van's conviction, and throughout his appeals in the Michigan state courts, he asserted that his denial of counsel at the consolidation hearing was a Sixth Amendment violation. No state court ever addressed the claim that the hearing was a critical stage of the criminal proceeding against him.

## V

This opinion addresses the following questions:

1) What is a "critical stage"? What parts of a criminal proceeding have the Supreme Court and our court heretofore treated as such a stage?

2) What analysis properly follows from a finding that a given component of a criminal proceeding is a critical stage? Is prejudice presumed, or do we engage in an inquiry for either prejudice or harmless error? As part of this inquiry, how does the total absence of defense counsel at this stage affect our analysis?

3) Is a Michigan consolidation hearing properly considered a critical stage?

4) If so, what follows from a total denial of counsel at such a hearing?

This opinion seeks to clarify the law that treats critical stages of criminal proceedings.

## VI

*Critical Stage Doctrine, 1960s-1980s*

Van argues before this court that he was denied counsel at a critical stage of his criminal proceeding.

Common law teaches that the Sixth Amendment views "critical stages" of a defendant's pre-trial and trial differently from other parts. The Supreme Court began developing a nationwide critical stage doctrine in earnest in *Hamilton v. Alabama*, 368 U.S. 52 (1961), in which the Court unanimously reversed the Alabama Supreme Court's denial of a criminal defendant's writ of error *coram nobis* in a capital case where the defendant's counsel had been absent at his arraignment. The Court wrote that "[w]hatever may be the function and importance of arraignment in other jurisdictions, we have said enough to show that in Alabama it is a critical stage in a criminal proceeding." *Id*. at 54 (footnote omitted). It was unnecessary to make a showing that the defendant suffered a disadvantage through absence of counsel. *Id*. at 53. Under Alabama law, "[w]hat happens [at an arraignment] may affect the whole trial. Available defenses may be as irretrievably lost, if not then and there asserted, as they are when an accused represented by counsel waives a right for strategic purposes." *Id*. at 53 (citations omitted). The possibility that something might have been "irretrievably lost" in this way sufficed to warrant reversal: "[w]hen one pleads to a capital charge without benefit of counsel, we do not stop to determine whether prejudice resulted." *Id*. at 55 (citations omitted). In such a case, the Court concluded, "the degree of prejudice can never be known. Only the presence of counsel could have enabled the accused to know all the defenses available to him and to plead intelligently." *Ibid*. In *White v. Maryland*, 373 U.S. 59 (1963), another capital case, the Supreme Court, per curiam, applied its *Hamilton* ruling to a Maryland pre-trial procedure that had functioned similarly to an arraignment: the defendant, unrepresented by counsel, pleaded guilty even though he was not obligated to enter any plea at the hearing, and the prosecution later used evidence of that plea against him in a trial that followed a subsequent not-guilty plea. Although the Supreme Court did not offer an explicit definition of a "critical stage," it declined to follow the Maryland appellate court's reasoning that *Hamilton* had functionally defined a "critical stage" as one "where rights are preserved or lost." *Id*. at 60.

The next year, the Supreme Court, citing both *Hamilton* and *White*, extended critical stage status to a moment that might not immediately strike either a learned or lay observer as a traditional part of a defendant's criminal proceeding. In *Massiah v. United States*, 377 U.S. 201 (1964), a federal prisoner's narcotics conviction was based in part on incriminating remarks he made, following indictment and while out on bail, to his erstwhile co-defendant who had secretly turned state's evidence by the time of their conversation. Law enforcement agents heard the defendant's comments via a radio transmitter that the co-defendant, cooperating with agents, had installed in his car. Because the defendant already had been indicted for a crime for which the incriminating statements later served as evidence, the Supreme Court ruled that he was entitled to have his lawyer present during any attempts deliberately to elicit testimonial evidence from him.

Our court first took up this line of doctrine in *Vitoratos v. Maxwell*, 351 F.2d 217 (6th Cir. 1965), a non-capital prosecution for sodomy in which we adopted the Ohio Supreme Court's view that "arraignment in Ohio is not always a 'critical stage' of the trial process" because, under the prevailing procedure of the time, "an accused may change his plea 'for good cause shown' at any time prior to commencement of trial . . . , and denial of a motion to change plea following appointment of counsel 'would constitute such good cause that a subsequent refusal by the trial court to permit a change of plea would constitute an abuse of discretion' reviewable as such." *Id*. at 221 (citations omitted). We affirmed the district court's denial of Vitoratos's habeas petition.

In the last four decades, the Supreme Court and our court have determined that a number of components of a criminal defendant's proceeding qualify as critical stages, and both courts have extended the doctrine to noncapital cases. In *United States v. Wade*, 388 U.S. 218 (1967), the Supreme Court held that a post-indictment, pre-trial lineup is a critical stage. The Court rejected Texas's argument that a lineup was a mere "preparatory step in the gathering of the prosecution's evidence," to be bucketed alongside "systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like." *Id*. at 227. These analytical steps differ from a lineup because they present "minimal risk that . . . counsel's absence . . . might derogate from [a defendant's] right to a fair trial." *Id*. at 228. The purpose of a lineup is to "elicit identification evidence," and such a procedure is "peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial," including the "vagaries of eyewitness identification." *Ibid*. Defense counsel can serve to counteract an eyewitness's suggestibility, and the prosecutor's suggestion in the "manner in which [he] presents the suspect to witnesses for pretrial identification." *Ibid*. In vacating the conviction in the case, the Court offered further outlines of a definition of a critical stage in the context of the Sixth Amendment guarantee of assistance of counsel: "The plain wording of this guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful 'defence.'" *Id*. at 225. In a conclusion with some import for our case, Justice Brennan, writing for the Court, ordered that the cause be remanded so that the district court might undertake harmless error analysis to assess whether the in-court identifications by the witnesses of the defendant were tainted by or otherwise products of their earlier identifications at the lineup. *Id*. at 241.

The same year it handed down *Wade*, the Supreme Court held unanimously that sentencing was a critical stage of a criminal proceeding where counsel's presence is required. *Mempa v. Rhay*, 389 U.S. 128 (1967). Though Justice Marshall's opinion for the Court did not use the phrase "critical stage" in this habeas action, it did note the "critical nature of sentencing in a criminal case" and held that absence of counsel at sentencing was itself a violation of the Sixth Amendment requiring the issuance of a writ of habeas corpus. *Id*. at 134. *See also Gardner v. Florida*, 430 U.S. 349 (1977) (affirming that sentencing is a critical stage).

We ruled in *United States v. Smith*, 411 F.2d 733 (6th Cir. 1969), that the moment when a jury returns its verdict is a critical stage such that absence of counsel due to illness requires a new trial. We cited and quoted *in extenso* the Tenth Circuit case of *Thomas v. Hunter*, 153 F.2d 834, 839 (10th Cir. 1946), for the proposition that defense counsel might exercise the defendant's right to poll the jury individually. Our court noted that, in Smith's case, the federal district judge who tried the case actually did poll the jury! But, as this was a critical stage of the proceeding, the judge's polling wasn't enough:

> Even this precaution does not negate the possibility of prejudice to the defendant in not having the aid of his attorney. From a reading of the record it is impossible to determine the tone of voice of the jurors when they individully announced their decision, the hesitancy of their responses, and other possibilities that could have taken place and had significant meaning. Had counsel been present and something of this nature occurred, the defendant would have had the benefit of his legal advice. We must presume that the defendant himself was ignorant of the legal significance of any such incident, and, without the aid of counsel, it would have passed unnoticed.

> It is not for this Court to speculate as to the extent of prejudice that may have resulted from the absence of counsel. In *Glasser v. United States*, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942), the Supreme Court was concerned with the prejudicial consequences of one co-defendant's retained attorney being appointed to represent the other co-defendant. In discussing the Sixth Amendment, the Court said:

> "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."

*Smith*, 411 F.3d at 736-37. We did not seek to explain, even conceptually, what the lawyer might have done to preserve his client's rights in the circumstances we contemplated. Indeed, we denied any need to explain, given our conclusion that this juncture in the proceeding was critical. In so doing, we indicated that whatever notional or analytical definition we or the Supreme Court might propound for the legal phrase "critical stage" could be incomplete. Previously, it seemed we had been heading toward an instrumental definition: a critical stage occurred where a defendant's right might otherwise be lost, or where the later course of the proceeding could otherwise be affected. In the case of the proceeding giving rise to *Smith*, the only activity by counsel we were able to imagine was the polling of jurors. Yet, where exactly this was accomplished by the judge, we nonetheless insisted that the moment of a verdict's being handed down is critical, even though we could not specify a way in which counsel might take action with downstream consequences. We intuited that absence of counsel at the moment of a jury's verdict is intrinsically wrong, that this wrongness rose to a constitutional level, and that it would be improper to overanalyze the "niceties" of that error. Noting that "[t]his Court has been jealous in its protection of Sixth Amendment rights," we ordered a new trial for Smith. *Id*. at 738.

The Supreme Court in *Coleman v. Alabama*, 399 U.S. 1 (1970), held that an Alabama pretrial hearing was a critical stage where the proceeding was not required by Alabama law (but was instead held at the discretion of the prosecutor) and where the "sole purposes of [the] preliminary hearing are to determine whether there is sufficient evidence against the accused to warrant presenting his case to the grand jury and, if so, to fix bail if the offense is bailable." *Id*. at 8 (citation omitted). The Court ruled this way even though, under binding Alabama court precedent, the State was barred from using at trial "anything that occurred at the hearing" held without counsel present. *Id*. at 9. Quoting *Wade*, the Court offered a further half-step toward cementing a definition of "critical stage," writing that the "determination whether the hearing is a 'critical stage' requiring the provision of counsel depends . . . upon an analysis 'whether potential substantial prejudice to defendant's rights inheres in the . . . confrontation and the ability of counsel to help avoid that prejudice.'" *Ibid* (quoting *Wade*, 388 U.S. at 227). Justice Brennan's opinion for a plurality of four Justices (Justice Black's concurrence agreed, *inter alia*, that this phase of the proceeding was a critical stage but did not sign on to the language of Justice Brennan's opinion in this particular) gave four examples of what counsel might do at such a pretrial hearing. He might 1) "expose," through examination and cross-examination, "fatal weaknesses in the State's case that may lead the magistrate to refuse to bind the accused over"; 2) "fashion a vital impeachment tool," through examination and cross-examination, "for use in the cross-examination of the State's witnesses at the trial"; 3) "more effectively discover the case the State has against his client and make possible the preparation of a proper defense to meet that case at the trial"; or 4) "mak[e] effective arguments for the accused on such matters as the necessity for an early psychiatric examination or bail." *Ibid*. Because the defendants did not have counsel present at this pretrial haring, the Court vacated their convictions. As usual in this line of doctrine, the Court did not engage in an analysis of whether, or how much, prejudice was visited upon the accused through absence of counsel at the critical stage. The *Coleman* Court's remedy did, however, point the way towards a harmless error analysis, to be undertaken by Alabama judges. Justice Brennan's opinion, in a portion joined by four other Justices, recalled the solution he had ordered in *Wade*:

> There remains, then, the question of the relief to which petitioners are entitled. The trial transcript indicates that the prohibition against use by the State at trial of anything that occurred at the preliminary hearing was scrupulously observed. *Cf. White v. Maryland*, *supra*. But on the record it cannot be said whether or not petitioners were otherwise prejudiced by the absence of counsel at the preliminary

hearing. That inquiry in the first instance should more properly be made by the Alabama courts. The test to be applied is whether the denial of counsel at the preliminary hearing was harmless error under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See United States v. Wade . . .* , 388 U.S. at 242, 87 S.Ct. at 1940.

*Coleman*, 399 U.S. at 10-11. Remarkably, as is shown throughout the exposition contained in our opinion, Brennan's *Wade-Coleman* remedy of remand for harmless error analysis has not been the courts' consistent approach to critical stage cases.

Our court held in *Sheely v. Whealon*, 525 F.2d 713 (6th Cir. 1975), that an Ohio plea hearing was a critical stage and that, where the trial court did not ask the defendant whether he had advice of counsel before his entry of a guilty plea, the court was not permitted to infer the defendant's waiver of his attorney's presence through his silence on the matter. The defendant's plea later was introduced into evidence at his trial. We specifically noted that, "[a]lthough petitioner did not object to the introduction of this evidence at the trial, the rationale of *Hamilton v. Alabama* . . . does not rest . . . on a showing of prejudice." *Id*. at 716 n. [unnumbered footnote] (internal citation omitted). The court decided not to proceed with analysis of Sheely's other claims. Having found that the defendant's counsel was absent at a critical stage of his proceeding, the court wrapped up its inquiry and ordered that a writ of habeas corpus be issued unless the state held a new trial "within a reasonable time." *Id*. at 717. The Supreme Court affirmed unanimously in *Iowa v. Tovar*, 541 U.S. 77 (2004) that a plea hearing is a critical stage of a criminal proceeding, even where the defendant is charged with operating a motor vehicle while intoxicated and driving while license barred.

The Supreme Court's decision in *Holloway v. Arkansas*, 435 U.S. 475 (1978), marked a slight shift in emphasis in the critical stage doctrine. The Burger Court accentuated the categorical nature of its inquiry more than the Brennan Court had done.[3] The defendants in the case, accused robbers and rapists, were denied their motion to appoint separate counsel. Through their appointed and collective lawyer, Harold Hall, they made this motion twice. Their attorney first made it on the non-specific grounds that there was a possible conflict of interest in their individual defenses. Following denial, he renewed the motion later, stating that "'one or two of the defendants may testify and if they do, then I will not be able to cross-examine them because I have received confidential information from them.'" *Id*. at 478. The trial court again denied the motion. Hall was unable to cross-examine each of his clients while on the stand in the interest of protecting the rights of his other two clients. Though Hall was by his clients' side throughout the criminal proceeding,

---

[3] An intervening case, decided in 1976, might be viewed as a half-step in the transition between the Brennan and Burger approaches to critical stage doctrine. In *Geders v. United States*, 425 U.S. 80 (1976), the Court held unanimously (8-0, as Justice Stevens did not take part) that a trial court's order barring communication between a defendant and his lawyer during a seventeen-hour overnight recess between direct and cross-examination violated the defendant's Sixth Amendment right to assistance of counsel. Chief Justice Burger wrote the Court's opinion reversing the Fifth Circuit's ruling, which had affirmed the defendant drug importer's conviction in the Middle District of Florida. The Fifth Circuit had noted that the appellant had made "no claim of actual prejudice accruing" from the overnight embargo on communications. *United States v. Fink*, 502 F.2d 1, 8 (5th Cir. 1974). He instead had relied on a Third Circuit opinion, *United States v. Venuto*, 182 F.2d 519 (3d Cir. 1950), which had held that a similar bar on communications between defendant and counsel – for eighteen hours – demanded no showing of actual prejudice in order to require reversal. The Fifth Circuit rejected this view and demanded a showing of harm, which it could not find. *Fink*, 502 F.2d at 9. The circuit court's holding was narrow, and Chief Justice Burger's opinion noted that the issue before the Supreme Court included the lower court's holding "that petitioner's failure to claim any prejudice resulting from his inability to consult with counsel during one evening of the trial was fatal to his appeal." *Geders*, 425 U.S. at 86. The Court reversed, thereby declining to require a claim of actual harm in this set of circumstances. This inclination not to require a showing of prejudice is a signal marker Chief Justice Burger's shift in critical stage analysis.

The *Geders* case does not use the language of "critical stage" in its reasoning or conclusions. However, it has been cited since as part of the background framework for subsequent critical stage inquiries. *See, e.g., Bell v. Cone*, 535 U.S. 685, 695-96 & n. 3 (2002).

Chief Justice Burger's opinion for the majority analogized the terms of his presence in the courtroom during the trial to absence during a critical stage. *Id.* at 489-90. It bears noting that, even though *Holloway* was a non-capital case, the Court cited its own precedents *Gideon v. Wainright*, 372 U.S. 335 (1963), *Hamilton*, and *White*, for the proposition that "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic." *Id.* at 489. Given *Holloway*'s factual particulars, this statement might be viewed as dictum. But it does reflect what appears to be the usual, if not perfectly consistent, tenor and vector of the Supreme Court's exposition of critical stage doctrine.

However, in the case of *McKeldin v. Rose*, 631 F.2d 458 (6th Cir. 1980), where a Tennessee petitioner was granted habeas relief by the district court on the grounds that he had not enjoyed counsel's presence at a preliminary hearing, we recalled Brennan's harmless error remands in *Coleman* and *Wade* and reversed, distinguishing the apparently bald and strong statement in *Holloway* and holding that, since the harmless error analysis already had been undertaken in the case to the satisfaction of the district court, the habeas petition should be denied. We quoted the above passage from *Holloway* and offered what amounted to a fact-focused distinction without much explanation:

> We do not believe the quotation from *Holloway* indicates a departure by the Supreme Court from the procedure prescribed in *Coleman*. In *Holloway* the Court was dealing with conflicting interests arising from joint representation of three codefendants by one appointed attorney. . . . [T]he Court concluded that prejudice is presumed and reversal automatic when a trial court requires joint representation over timely objection. In this context the Court stated that reversal is automatic . . . .

*McKeldin*, 631 F.3d at 460. Perhaps we implied then that Holloway's statement on the matter of automatic reversal was dictum. But it is necessary for us to recognize that our court sought in *McKeldin* to revive Justice Brennan's early brand of critical stage remedy, using harmless error analysis.

The Supreme Court recognized that a psychiatric interview – or, perhaps more properly, consent to a psychiatric interview – was a critical stage in *Estelle v. Smith*, 451 U.S. 454 (1981).[4] In this capital case originating in Texas, the defendant's counsel was not notified about a pretrial psychiatric examination to take place in jail, at which the doctor determined that the defendant, accused of murder, was competent to stand trial. Following conviction, the same jury heard testimony during the sentencing phase. Defense counsel objected to the appearance of the doctor even though he was not listed among the state's named witnesses for either the guilt or penalty phase of the trial. The doctor's testimony was based on his pretrial examination. He spoke, *inter alia*, to the defendant's future dangerousness, one of the questions before the jury. The jury resolved the matters before it, including this one, against the defendant. The death penalty was imposed mandatorily. The federal district court issued a writ of habeas corpus, and the Fifth Circuit affirmed.

Chief Justice Burger, writing for the Court (in a case that yielded both a unanimous judgment and unanimity as to the defendant's Sixth Amendment claim) and introducing a new word to this jurisprudence, found that the defendant's Sixth Amendment guarantee of counsel was abridged by the use of the doctor's testimony because the psychiatric interview "proved to be a 'critical stage'

---

[4]For completeness, the Court's opinion noted that it was unclear whether defense counsel was given any timely notice about the examination. *Id.* at 459 n.5 and 471 n.15. However, the Court was clear that, at minimum, defense counsel was not told that the defendant's future dangerousness would be a subject of the examination. *Id.* at 470-71. The defendant had to choose, on his own and without the "guiding hand of counsel," whether to undergo the psychiatric exam in the first place. *Powell v. Alabama*, 287 U.S. 45, 69 (1932)

of the *aggregate* proceedings against the respondent." *Id*. at 470 (emphasis supplied). Assuming that the qualifier "aggregate" was not inserted as mere verbiage, we come away with the impression that the Court acknowledged the comparatively fluid and permissive nature of what we might call "critical stageness" – that a cumulative, if not quite impressionistic, analysis might trump a piecemeal inquiry into the typical import of what happens at a particular event in a criminal proceeding. In other words, it might not be obvious, *ex ante*, that a decision to undergo a psychiatric examination is necessarily one where counsel's advice can be crucial. But it became clear to the Court, having considered what can sometimes happen at or following such an examination, that the right to assistance of counsel attaches in general at that moment.

Importantly, none of the federal courts that considered the habeas petition in the matter of *Estelle* either ordered or engaged in harmless error analysis. The Supreme Court affirmed the ruling of the Fifth Circuit, which had affirmed the district court's setting aside of the death sentence. *Smith v. Estelle*, 602 F.2d 694 (5th Cir. 1979); *Smith v. Estelle*, 445 F. Supp. 647 (N.D. Tex. 1977). The absence of counsel at this momentous instant in the criminal proceeding was enough to vacate the death penalty.

## VII

### *United States v. Cronic*

In 1984, the Supreme Court decided *United States v. Cronic*, 466 U.S. 648 (1984), a case of special interest for our inquiry. The opinion in this case included a strong statement that no prejudice need be shown where counsel was absent at a critical stage of a criminal proceeding. Two prefatory comments are useful here before we make our extended examination of the decision. First, this case was not about a critical stage, nor did it involve an absent lawyer. Second, *Cronic* was handed down the same day as *Strickland v. Washington*, 466 U.S. 668 (1984). From time to time, this has caused confusion. Strickland set forth the Court's two-part inquiry into ineffective assistance of counsel, requiring that a petitioner show both ineffectiveness and prejudice. *Cronic* specified circumstances of alleged ineffective assistance of counsel understood by the Court to require no showing of prejudice. Chief among these was the absence of counsel at a critical stage. *Strickland*'s prejudice analysis covered cover all other circumstances. Again, as explained *infra*, the Supreme Court in *Bell* felt it useful to clarify the separation and applicability of these two frameworks.

*Cronic* was an appeal from a federal conviction for mail fraud. The defendant's lawyer was essentially new to criminal proceedings, and he had less than a month to prepare for the trial, while the government enjoyed four and a half years to investigate and had examined thousands of pages of documentation in preparation for the case. The Tenth Circuit reversed the conviction, finding it unnecessary to examine the lawyer's performance on the grounds that ineffectiveness could be inferred from a combination of, *inter alia*, his inexperience, the complexity of the case, and the short time he had to get ready.

The Supreme Court reversed. Justice Stevens wrote for a unanimous Court that the Tenth Circuit should have analyzed the lawyer's actual conduct. It should not merely have inferred ineffective assistance of counsel. The Court wrote that claims of ineffective assistance of counsel typically ought to be made "by pointing to specific errors made by trial counsel." *Cronic*, 466 U.S. at 666 (footnote omitted). In fact, the Court wrote that, should any such claims of specific error be made on remand in the case, they should be "evaluated under the standards enunciated in *Strickland v. Washington*." *Id.* at 667 n. 41. (citation omitted).

The only exception to the rule of specificity obtained where "surrounding circumstances justify a presumption of ineffectiveness." *Id.* at 662. In those cases, a "Sixth Amendment claim [would] be sufficient without inquiry into counsel's actual performance." *Ibid.* (footnote omitted).

These circumstances would be of atypical "magnitude" such that "they are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658-59.

And then, in a passage with concrete import for our own analysis, Justice Stevens listed the circumstances that passed muster. He gave three:

> Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial.[25] Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. No specific showing of prejudice was required in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), because the petitioner had been "denied the right of effective cross-examination" which " 'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.' " *Id.*, at 318, 94 S.Ct., at 1111 (*citing Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 749, 19 L.Ed.2d 956 (1968), and *Brookhart v. Janis*, 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966)).[26]
>
> Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), was such a case.

---

[25]The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding. *See, e.g., Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); *Brooks v. Tennessee*, 406 U.S. 605, 612-613, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972); *Hamilton v. Alabama*, 368 U.S. 52, 55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961); *White v. Maryland*, 373 U.S. 59, 60, 83 S.Ct. 1050, 1051, 10 L.Ed.2d 193 (1963) (per curiam); *Ferguson v. Georgia*, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961); *Williams v. Kaiser*, 323 U.S. 471, 475-476, 65 S.Ct. 363, 366, 89 L.Ed. 398 (1945).

[26]Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt. *See Strickland v. Washington*, 466 U.S., at 693-696, 104 S.Ct., at 2067-2069; *see generally Davis v. Alabama*, 596 F.2d 1214, 1221-1223 (CA5 1979), *vacated as moot*, 446 U.S. 903 (1980); *Cooper v. Fitzharris*, 586 F.2d 1325, 1332-1333 (CA9 1978) (*en banc*); *McQueen v. Swenson*, 498 F.2d 207, 219-220 (CA8 1974); *United States ex rel. Green v. Rundle*, 434 F.2d 1112, 1115 (CA3 1970); Bines*, Remedying Ineffective Representation in Criminal Cases: Departures from Habeas Corpus*, 59 Va. L. Rev. 927 (1973); Note, *Ineffective Representation as a Basis for Relief from Conviction: Principles for Appellate Review*, 13 Colum. J. Law & Social Prob. 1, 76-80 (1977).

*Id.* at 659-60 & nn.25-26.  Because the facts of *Cronic* did not present any of these three sets of circumstances, the Court reversed.

*Cronic* continues to be the dominant decision in critical stage doctrine.  In *Kimmelman v. Morrison*, 477 U.S. 365 (1986), the Supreme Court considered the case of a New Jersey convict petitioning for a writ of habeas corpus on the ground that certain incriminating evidence had been obtained in violation of his Fourth Amendment protections.  The defendant's claims were also wrapped into an ineffective assistance of counsel argument.  Citing *Strickland*, 466 U.S. at 688, the Supreme Court noted that "[i]n order to establish ineffective representation, the defendant must prove both incompetence and prejudice."  *Kimmelman*, 477 U.S. at 381.  The Court then added a footnote, citing *Cronic* and other cases, explaining: "[w]e refer here only to cases in which the defendant alleges 'actual' ineffective assistance rather than the few contexts where ineffective assistance is 'presumed,' such as where counsel is either totally absent or prevented from assisting the accused during a critical stage of the proceeding . . . ."  *Id.* at 381 n.6.

In the case of *Penson v. Ohio*, 488 U.S. 75 (1988), the Ohio Court of Appeals allowed defendant's counsel to withdraw after he filed a certification that he viewed the appeal as meritless.  The court denied the defendant's motion for new counsel.  The appellate court examined the case on its own and concluded that the lawyer's certification was itself very dubious because the appellant had multiple arguable claims.  The court then reversed one of the defendant's convictions and affirmed the others.  The Ohio Supreme Court dismissed the defendant's further appeal.  In reversing by a vote of 8 to 1, the United States Supreme Court relied mostly on *Anders v. California*, 386 U.S. 738 (1967).  However, the Court "emphasize[d] that the denial of counsel in [the] case left petitioner completely without representation during the appellate court's actual decisional process."  *Penson*, 488 U.S. at 88.  This total denial was different from the mere failure to make this or that argument on appeal.  *Ibid.*  The Court analogized its ruling in this case to its holdings in critical stage cases where counsel was absent at trial.  *Ibid.* (*citing Cronic*, 466 U.S. at 659).  The Court held that prejudice was to be assumed.  It stated expressly that neither *Strickland* prejudice review nor the harmless error analysis of *Chapman v. California*, 386 U.S. 18 (1967), was appropriate.  *Penson*, 488 U.S. at 88-89.

In 1992, we held that a sidebar bench conference during a criminal trial was a critical stage.  *United States v. Minsky*, 963 F.2d 870 (6th Cir. 1992).  We held that a district court's *ex parte* discussion at such a sidebar with the prosecutor but not with defense counsel was a violation of the defendant's rights during a critical stage of the proceeding against him, even where the trial court explained its *ex parte* conference as a necessary part of its *in camera* review of certain evidence.  We quoted footnote 25 from *Cronic* for the proposition that the Supreme Court "has uniformly found constitutional error without any showing of prejudice when counsel was either totaly absent or prevent from assisting the accused during a critical stage of the proceeding."  *Id.* at 874 (quoting *Cronic*, 466 U.S. at 659 n.25).

In the last several years, our court has recognized as critical stages both the issuance of jury reinstructions and the pretrial period, broadly defined.  In *French v. Jones*, 332 F.3d 430 (6th Cir. 2003), a panel affirmed the district court's grant of a writ of habeas corpus where the "trial judge delivered a supplemental instruction to a deadlocked jury" without the presence of the defendant's counsel.  *Id*. at 438.  We cited *Penson*, *Brecht*, and *Cronic*, *inter alia*, in support of our conclusion that harmless error analysis was not warranted where counsel was shown to be absent during a critical stage.  *Id*. at 438-39.  This court confirmed and reiterated the holding of *French* in *Caver v. Straub*, 349 F.3d 340, 350 (6th Cir. 2003), a case presenting similar facts, both with respect to the status of jury reinstruction as a critical stage and to the presumption of prejudice.  In *Hudson v. Jones*, 351 F.3d 212 (6th Cir. 2003), we declined to extend critical stage status to a court's *re*-reading of specific jury instructions that had already been read, in presence of defense counsel, to the jury.

*Mitchell v. Mason*, 325 F.3d 732 (6th Cir. 2003), signaled a development in our approach to the doctrine now under consideration. The case designated a broad time period, the season of pretrial investigation and preparation, as a critical stage. Habeas petitioner Charlie Lee Mitchell had been appointed an unusually terrible trial lawyer named Gerald K. Evelyn. This attorney represented Mitchell at preliminary examination and a bail hearing. His law license was then suspended for a little over a month. His poor (non-)performance continued at trial, where he did not make an opening argument. *Id*. at 735. Before the trial, Mitchell complained in six letters addressed to the trial court that Evelyn had never visited him in prison nor consulted with him in court. This claim was supported by witness testimony. The trial court denied Mitchell's motion to withdraw Evelyn as counsel. *Id*. at 736. The same judge ruled, at a special state court hearing convened for the purpose of adducing evidence on an ineffective assistance of counsel claim, that Mitchell had not shown prejudice and that he had benefitted from effective assistance. *Ibid*. The district court granted Mitchell's federal habeas petition, and we affirmed this grant in *Mitchell v. Mason*, 257 F.3d 554 (6th Cir. 2001). In a one-line order, the Supreme Court vacated our decision and remanded to our court for further review in light of its recent decision in *Bell v. Cone*, 535 U.S. 685 (2002) (discussed immediately *infra*). *Mason v. Mitchell*, 536 U.S. 901 (2002). Upon remand, and in light of *Bell*, we reaffirmed the district court's grant of Mitchell's habeas petition. 325 F.3d at 737. We held that Evelyn's total absence during the period of his suspension from practice, his near-total absence during the six additional months of his representation, and the fact that he spent only six minutes with Mitchell "in the bullpen," constituted a "complete denial of counsel during at a critical stage of the proceedings." 325 F.3d at 741. We then characterized the entire "pre-trial period" as "indeed a critical stage." *Id*. at 742. District Judge James G. Carr, sitting by designation, dissented, writing that the court ought to have undertaken a *Strickland* analysis and thereby required a showing of prejudice. *Id*. at 748-49 (Carr, D.J., dissenting) (citing his earlier, more detailed dissent from the previous hearing of the case, at 257 F.3d 544, 574-80).

The substance of the disagreement between Judge Carr and the majority in *Mitchell v. Mason* is better understood in light of the *Bell v. Cone* dispute. 535 U.S. 685 (2002). In that case, the Supreme Court sought to clear up confusion that stemmed from the simultaneous decisions in *Cronic* and *Strickland*. *Bell*, which was decided 8 to 1, reversed a decision of our court in *Cone v. Bell*, 243 F.3d 961 (6th Cir. 2001). Cone was convicted of murder and other crimes in a Tennessee state court. He eventually filed a federal habeas petition, and the district court issued a Certificate of Appealability. We granted the petition as applied to Cone's death penalty on the ground that he had received ineffective assistance of counsel at sentencing. Like *Cronic*, this was a case in which the lawyer was present throughout the trial but whose performance was challenged as deficient. Cone's lawyer put on no evidence and offered no argument at the penalty phase. Our opinion took critical stage doctrine in an apparently unprecedented – and, since then, apparently unduplicated – direction. We momentarily melded classic critical stage inquiry, perhaps precipitously, with *Strickland* effective assistance analysis. We cited *Cronic* for the proposition that "a presumption of prejudice is raised by counsel's behavior" so "Cone need not show actual prejudice." *Cone*, 243 F.3d at 979. Our opinion concluded that "[e]ssentially, Cone did not have counsel during the sentencing phase of his trial and thus the prosecutor's insistence that justice required that Cone be put to death was not subjected to 'meaningful adversarial testing.' *Cronic*, 466 U.S. at 656 . . . ." *Ibid*. We held that "counsel's abandonment of Cone at possibly the most 'critical stage of his trial' fell below an objective standard of reasonableness and prejudiced him, which resulted in the ineffective assistance of counsel under the Sixth Amendment." *Ibid*. (quoting and citing *Cronic* at 659). At bottom, our opinion suggested that having a totally silent lawyer by one's side was tantamount to have no lawyer at all. We undertook the two-pronged analysis of *Strickland*, but we leaned on *Cronic* to hold that no prejudice need be shown if the alleged "abandonment" by counsel had taken place during a critical stage.

Chief Justice Rehnquist, writing for the Supreme Court in its review of our decision, refreshed and explained the difference between the *Cronic* and *Strickland* frameworks. *Cronic* was

meant to cover those cases in which prejudice was to be assumed. *Strickland* would address cases in which prejudice needed to be shown. Three circumstances were cited where *Cronic* prevailed:

1) If the defendants suffers "complete denial of counsel." *Bell*, 535 U.S. at 695 (quoting *Cronic*, 466 U.S. at 659). The Court's wording of this first example bears close scrutiny. The Chief Justice's opinion gave "complete denial of counsel" as the first example, full-stop. The sentence ends there. The next sentence introduces the phrase "critical stage" for the first and only time in the opinion. It reads: "A trial would be presumptively unfair, we said [in *Cronic*], where the accused is denied the presence of counsel at 'a critical stage,' . . . , a phrase we used in *Hamilton v. Alabama* . . . and *White v. Maryland* . . . to denote a step of a criminal proceeding, such as an arraignment, that held significant consequences for the accused." *Bell*, 535 U.S. at 695-96 (citing and quoting *Cronic*, 466 U.S. at 659) (citations omitted).

It is likely, but it is not obvious or necessary to conclude, that the second sentence, in the eyes of the *Bell* Court, modified the substance of the first. Depending on how we read the import of the second sentence, either complete denial of counsel at any stage of the criminal proceeding would qualify for *Cronic* review, or only those complete denials that took place at critical stages would meet the standard. The reason we cannot simply dismiss the first interpretation is that the other two examples offered by the *Bell* Court as to when *Cronic* analysis governs are not limited to critical stages.

2) If "'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing,'" no prejudice need be shown. *Id.* at 696 (quoting *Cronic*, 466 U.S. at 659).

3) "[W]here counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected." *Ibid.* (citing *Cronic*, 466 at 659-62, and *Powell v. Alabama*, 287 U.S. 45 (1932)). Every other kind of ineffective assistance claim was subject to *Strickland* analysis.[5] The

---

[5] Because the language of the *Bell* opinion here may bear precise consultation, and because it offers a strong and recent articulation of the Supreme Court's reading of *Cronic*, the relevant section is reproduced:

In *Strickland*, which was decided the same day as *Cronic*, we announced a two-part test for evaluating claims that a defendant's counsel performed so incompetently in his or her representation of a defendant that the defendant's sentence or conviction should be reversed. We reasoned that there would be a sufficient indication that counsel's assistance was defective enough to undermine confidence in a proceeding's result if the defendant proved two things: first, that counsel's "representation fell below an objective standard of reasonableness," 466 U.S., at 688, 104 S.Ct. 2052; and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.*, at 694, 104 S.Ct. 2052. Without proof of both deficient performance and prejudice to the defense, we concluded, it could not be said that the sentence or conviction "resulted from a breakdown in the adversary process that rendered the result of the proceeding unreliable," *id.*, at 687, 104 S.Ct. 2052, and the sentence or conviction should stand.

In *Cronic*, we considered whether the Court of Appeals was correct in reversing a defendant's conviction under the Sixth Amendment without inquiring into counsel's actual performance or requiring the defendant to show the effect it had on the trial. 466 U.S., at 650, 658, 104 S.Ct. 2039. We determined that the court had erred and remanded to allow the claim to be considered under *Strickland*'s test. 466 U.S., at 666-667, and n. 41, 104 S.Ct. 2039. In the course of deciding this question, we identified three situations implicating the right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.*, at 658-659, 104 S.Ct. 2039.

First and "[m]ost obvious" was the "complete denial of counsel." *Id.*, at 659, 104 S.Ct. 2039. A trial would be presumptively unfair, we said, where the accused is denied the presence of counsel at "a critical stage," *id.*, at 659, 662, 104 S.Ct. 2039, a phrase we used in *Hamilton v. Alabama*, 368 U.S. 52, 54, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), and *White v. Maryland*, 373 U.S. 59, 60, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963) (per curiam), to denote a step of a criminal proceeding, such as arraignment,

instance alleged in *Bell* was properly within *Strickland*'s ambit.  The Court rejected Cone's argument that his lawyer's conduct fell into the second category listed above, because the failure he ascribed to his lawyer was not "complete" but rather putatively took place only at "specific points" of the sentencing proceeding."  *Id*. at 697.

Most recently, in *King v. Bobby*, 433 F.3d 483 (6th Cir. 2006), we reiterated our view that "[p]lea negotiations, guilty plea hearings, and sentencing hearings are all 'critical stages' at which the right to counsel attaches."  *Id*. at 490.

From time to time, the Supreme Court and our court have limited the reach of the critical stage doctrine.  A quick cataloguing of the chief examples of limitation is helpful here.  In *Waddy v. Heer*, 383 F.2d 789 (6th Cir. 1967), we affirmed the denial of habeas for Tennessee defendants who did not have access to counsel at a preliminary hearing where they made their first guilty pleas to assault to commit murder in the first degree and other more minor charges.  Following that preliminary hearing, the defendants retained counsel and were then indicted by a grand jury.  For some reason, the guilty pleas were not presented to the court, and it appeared that the defendants' trial was to proceed.  The habeas petitioners claimed that, on the first day of the trial, their lawyers indicated that their earlier guilty pleas would be introduced as evidence against them.  Relying on this advice, the defendants agreed to discuss a guilty plea with the prosecution and judge.  During the conversation with the judge, the defendants' earlier guilty pleas were not discussed or otherwise referenced.  The defendants ended up pleading guilty and agreeing to a certain sentence, the length of which was a matter of dispute before our court.  In denying the petition, we distinguished Maryland's preliminary hearing considered in *White* from the Tennessee hearing in our case on the grounds that the guilty plea was never introduced into evidence in our case.  We reiterated the substance of this conclusion, as applied to Tennessee's preliminary hearings, in *Carr v. Henderson*, 385 F.2d 531 (6th Cir. 1967).  In *Watmuff v. Perini*, 427 F.2d 527 (6th Cir. 1970), which featured a chronology fairly similar to those in *Waddy*, we extended this rule to Ohio's preliminary hearings, which were legally comparable to Tennessee's.

---

that held significant consequences for the accused. [footnote 3]  Second, we posited that a similar presumption was warranted if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic, supra,* at 659, 104 S.Ct. 2039.  Finally, we said that in cases like *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), where counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected. *Cronic, supra,* at 659-662, 104 S.Ct. 2039.

[footnote 3] In a footnote, we also cited other cases besides *Hamilton v. Alabama* and *White v. Maryland* where we found a Sixth Amendment error without requiring a showing of prejudice. Each involved criminal defendants who had actually or constructively been denied counsel by government action. *See United States v. Cronic*, 466 U.S. 648, 659, n. 25, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (*citing Geders v. United States*, 425 U.S. 80, 91, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (order preventing defendant from consulting his counsel "about anything" during a 17-hour overnight recess impinged upon his Sixth Amendment right to the assistance of counsel); *Herring v. New York*, 422 U.S. 853, 865, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (trial judge's order denying counsel the opportunity to make a summation at close of bench trial denied defendant assistance of counsel); *Brooks v. Tennessee*, 406 U.S. 605, 612-613, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972) (law requiring defendant to testify first at trial or not at all deprived accused of "the 'guiding hand of counsel' in the timing of this critical element of his defense," i.e., when and whether to take the stand); *Ferguson v. Georgia*, 365 U.S. 570, 596, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961) (statute retaining common-law incompetency rule for criminal defendants, which denied the accused the right to have his counsel question him to elicit his statements before the jury, was inconsistent with Fourteenth Amendment); *Williams v. Kaiser*, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398 (1945) (allegation that petitioner requested counsel but did not receive one at the time he was convicted and sentenced stated case for denial of due process)).

*Bell*, 535 U.S. at 695-96 & n.3.

In *Lundberg v. Buchkoe*, 389 F.2d 154 (6th Cir. 1968), we denied a writ of habeas corpus to a prisoner serving a life sentence for murder after extending this rationale to arraignments and preliminary examinations in Michigan. Lundberg noted that he was compelled to appear at an arraignment the day before his arrest, and that, at this arraignment, he waived preliminary examination. Our court rejected his view that these proceedings were necessarily critical stages in the criminal action against him. We adopted the Fourth Circuit's interpretation of Supreme Court precedent to the effect that "'if the effectiveness of legal assistance ultimately furnished an accused is likely to be prejudiced by its prior denial, the earlier period may be deemed a critical stage in the judicial process . . . . [But the Supreme Court has not] permit[ted] us to extend the duty of the State to appoint counsel in proceedings where even the likelihood of later prejudice arising from the failure to appoint is absent.'" *Id.* at 158 (quoting *DeToro v. Pepersack*, 332 F.2d 341, 343-44 (4th Cir. 1964). In Michigan, unlike in Maryland, preliminary hearings were not for entry of pleadings but instead for "the limited purpose only [of] the determination by a magistrate whether there is probable cause to bind the defendant over for trial." *Ibid.* (internal quotation marks and citations omitted). Nothing about the proceedings in *Lundberg* made them critical. The defendant didn't enter any plea or make a statement, and he didn't waive or lose a right or defense. We added that the "fact that appellant might have received some collateral benefit in the form of pretrial discovery had he not waived examination is immaterial." *Ibid.* Our court viewed the existence of a possibility of a comparatively minor advantage, where that advantage carried no ultimate and unrecoverable substantive import for the defendant, as insufficient to make a particular proceeding into a critical stage.

In *United States v. Clayton*, 418 F.2d 1274 (6th Cir. 1969), we declined to extend the rule of *United States v. Smith*, 411 F.2d 733 (1969), to the moment of presentation of a jury verdict where the judge informed the defendant of his right to counsel for that moment and appointed his co-defendant's counsel as his temporary lawyer for the presentation, and where the defendant agreed to that temporary appointment.

The Supreme Court declined to extend critical-stage status to the taking of a defendant's handwriting exemplars. *Gilbert v. California*, 388 U.S. 263 (1967). It also declined to find that post-indictment presentation of photographs, including a photograph of the accused, for the purpose of providing an opportunity for a witness to identify the offender, was a critical stage. *United States v. Ash*, 413 U.S. 300 (1973). The Court distinguished a photographic display from a lineup on the grounds that viewing photos admitted of fewer opportunities for prosecutorial suggestion and witness suggestibility. Justice Blackmun's opinion for the majority reasoned that defense counsel could easily reconstruct at trial any unfairness that obtained at the photographic display–for example, by recreating a suggestive presentation of the pictures, or by showing the jury that the picture of the defendant was qualitatively different from the others offered to the witness. "Accordingly, an accused would not be foreclosed from an effective cross-examination of an identification witness simply because his counsel was not present at the photographic display. For this reason, a photographic display cannot fairly be considered a 'critical stage' of the prosecution." *Id.* at 324-25. We held in *United States v. Tisdale*, 952 F.2d 934, 940 (6th Cir. 1992), that a probation officer should "honor the request" of a defendant to have counsel present at his presentence interview, at least in a non-capital case, but that such an interview is not a critical stage in the criminal proceeding, and thus absence of counsel does not require automatic vacating of a sentence.

## VIII

It is settled that a complete absence of counsel at a critical stage of a criminal proceeding is a *per se* Sixth Amendment violation warranting reversal of a conviction, a sentence, or both, as applicable, without analysis for prejudice or harmless error. *See, e.g.*, *Smith*, 411 F.2d at 736-37 ("It is not for this Court to speculate as to the extent of prejudice that may have resulted from the

absence of counsel."); *Sheely*, 525 F.2d 716 n. [unnumbered footnote]("[a]lthough petitioner did not object to the introduction of this evidence [of the guilty plea, entered at the critical plea stage without benefit of counsel] at the trial, the rationale of *Hamilton v. Alabama* . . . does not rest . . . on a showing of prejudice." (internal citation omitted)); *Holloway*, 435 U.S. at 489 ("[W]hen a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic."); *Cronic*, 466 U.S. at 659-60 ("The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial."); *Penson*, 488 U.S. at 88-89 (neither *Strickland* prejudice review nor the harmless error analysis of *Chapman* is appropriate when counsel is absent at a critical stage).

But what is a critical stage? How do we know if a Michigan consolidation hearing is such a stage?

One would welcome a comprehensive and final one-line definition of "critical stage." The case law available suggests that the pithy definitions we have do not simply capture the sometimes permissive or inclusive conclusions by the Supreme Court and our court that this or that period, moment, or event in the course of a criminal proceeding is a critical stage. However, the Supreme Court and our court have offered six short definitional statements over time:

1) A critical stage presents a moment when "[a]vailable defenses may be irretrievably lost, if not then and there asserted." *Hamilton*, 368 U.S. at 53.

2) A critical stage is one "where rights are preserved or lost." *White*, 373 U.S. at 60.

3) Counsel's assistance is guaranteed "whenever necessary to mount a meaningful defence." *Wade*, 388 U.S. at 225 (internal quotation marks omitted).

4) Determination as to "whether a hearing is a 'critical stage' requiring the provision of counsel depends . . . upon an analysis 'whether potential substantial prejudice to defendant's rights inheres in the . . . confrontation and the ability of counsel to help avoid that prejudice.'" *Coleman*, 399 U.S. at 9 (quoting *Wade*, 388 U.S. at 227).

5) A critical stage holds "significant consequences for the accused." *Bell*, 535 U.S. at 696.

6) In *Lundberg*, our court defined a "floor" for analysis as to whether a phase in a criminal proceeding may be considered critical. We do not label as a critical stage "proceedings where even the likelihood of later prejudice arising from the failure to appoint is absent.'" *Lundberg*, 389 F.2d at 158 (quoting *DeToro v. Pepersack*, 332 F.2d 341, 343-44 (4th Cir. 1964)).

All six of these definitions are question-begging. Deciding whether a particular part of a criminal proceeding holds consequences, is necessary to mount a meaningful defense, or contains potential substantial prejudice to rights demands an inquiry into the *possibility* of consequences. If those consequences are possible but not certain, how do we answer if they are adequately possible without undertaking an analysis that resembles an inquiry for prejudice? For example, if the absence of counsel at a consolidation hearing can be counteracted by a subsequent motion to sever, isn't the potential for adverse consequences thereby radically diminished or eliminated? At the same time, isn't that really an inquiry into whether the consequences are likely enough to have visited prejudice on the defendant's case? This is very similar to the kind of inquiry we are not supposed to undertake when fundamental protections are at stake and a defendant's lawyer simply wasn't there.

But however similar this derivative prejudice analysis is to the proscribed one, it – or some version of it – is exactly what precedent demands of us. In order to assess if a given portion of a criminal proceeding is a critical stage, we must ask how likely it is that significant consequences

might have resulted from the absence of counsel at the stage of the criminal proceeding. In *Lundberg*, we have the floor: the likelihood must be more than absent. But what is the threshold of adequacy for the "potential[ity]" of the "substantial prejudice to defendant's rights"? *Coleman*, 399 U.S. at 9 (quoting *Wade*, 388 U.S. at 227). There must be a reasonable likelihood that such prejudice will arise from complete absence of counsel. The Supreme Court has used the standard of "reasonable likelihood" as a guiding tool in the jurisprudence of effective assistance of counsel. *See, e.g., United States v. Gonzalez-Lopez*, 126 S. Ct. 2557, 2563 (2006) ("Counsel cannot be 'ineffective' unless his mistakes have harmed his defense (or, at least, unless it is reasonably likely that they have)."); *Strickland*, 466 U.S. at 696 (stating that "a court making the prejudice inquiry" in ineffective assistance of counsel cases must decide if "the decision reached would reasonably likely have been different absent the errors" of defense counsel). The Court also routinely has used the standard of reasonable likelihood as the test for whether a jury interpreted a disputed instruction in a manner that prohibited it from weighing constitutionally relevant evidence. *See, e.g., Brown v. Payton*, 544 U.S. 133, 142 (2005); *Smith v. Texas*, 543 U.S. 37, 47 (2004). Indeed, in a dissent, three members of the Court adverted to the reasonable likelihood standard in one of the seminal cases in critical stage doctrine, albeit as that standard applied to a matter other than critical stage analysis. In *Holloway*, 435 U.S. at 495, Justice Powell's dissent explained that defense counsel must normally object to joint representation of co-defendants early in the criminal proceeding, and that the attorney must "make a showing of a reasonable likelihood of prejudice" in order to prevail. The reasonable likelihood standard is used for weighty criminal matters of constitutional dimension. We consider the standard appropriate for critical stage analysis.

If the consolidation hearing was a critical stage, because Van's counsel was entirely absent, there is no need to make a showing of prejudice. Whether it was a critical stage depends on whether there was a reasonable probability that Van's case could suffer significant consequences from his total denial of counsel at the stage. Perhaps the best way of reaching an answer to that query is to ask whether Van had any opportunity, subsequent to the consolidation hearing, to recover or exercise whatever privilege he lost at the hearing.

### *Motion to Sever*

We therefore ask whether Van's counsel could have cured the potential harm arising from his absence by making a motion to sever later in the proceeding against his client. There is no indication that a motion to sever was made at any time during the proceeding against Roeur Van. Nonetheless, if we are able to ascertain both that such a cure would be an excellent substitute for the failure to contest the state's motion to consolidate at the original hearing, and that a motion to sever would have received the same consideration that an argument against consolidation would have been at the moment of counsel's absence, we might conclude that no potential harm could have been visited on Van from his lawyer's having failed to appear. Michigan's Rules of Court provide for severance of the proceedings against multiple criminal defendants. The most recent text of the relevant rule appears to date from 1985:

> MCR 6.121 Joinder and Severance of Multiple Defendants
> (A) **Permissive Joinder.** . . .
> (B) **Right of Severance; Unrelated Offenses.** On a defendant's motion , the court must sever offenses that are not related as defined in MCR 6.120(B).[**6**]
> (C) **Right of Severance; Related Offenses.** On a defendant's motion, the court must sever the trial of defendants on related offenses on a showing that severance is necessary to avoid prejudice to substantial rights of the defendant.

---

**6**MCR 6.120(B) defines related offenses that are those "based on (1) the same conduct, or (2) a series of connected acts or acts constituting part of a single scheme or plan." MCR 6.120(B) (1985).

(D) **Discretionary Severance.** On the motion of any party, the court may sever the trial of defendants on the ground that severance is appropriate to promote fairness to the parties and a fair determination of the guilt or innocence of one or more of the defendants. Relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of defendants or the complexity or nature of the evidence, the convenience of witnesses, and the parties' readiness for trial.

MCR 6.121 Michigan Court Rules of 1985 (emphasis in original). Explanatory comments attached to MCR 6.121 tend to indicate that joint trials are favored. *See, e.g.,* 1989 Staff Comment on MCR 6.121 Subrule (C) (the standard that must be met for severance "is said to reflect a strong policy in favor of joint trials"); 1B Gillespie Mich. Crim. L. & Proc. § 20:29 ("There is a strong policy in favor of joint trials.") (citing *People v. Hana*, 447 Mich. 325 (1994)). This understandable tendency, when combined with the fact that no party does or could reasonably argue that Van's offensive conduct was legally unrelated to Ket's, suggests that any motion to sever that might have been made by Van's lawyer later in the criminal proceeding would have met with failure. However, the severance standards given above are essentially the same as the standards for the original motion to consolidate. The judge's own language in granting the consolidation referred to there being "no reason to sever."

In addition, the overarching legal question of whether a particular proceeding is a "critical stage" of the trial should focus not only on the specific case before us, but the general question of whether such a stage is "critical." As set forth above, many of the stages found to be critical are those in which an opportunity may be irretrievably lost, or material may come out that may be incurably damaging. For example, even inadmissible evidence that might be stricken from a trial could be useful to the prosecution, if a defense lawyer is not available to guard against such a possibility. Courts appear to have distinguished between the greater possibility of prejudice from a personal lineup where counsel is not present from a photographic "show up" where the vividness of identification is not as indelible, and the possibility of recreation of the circumstances is much more total. Here, it seems that the balance tips on the side of this being a procedural step where counsel's absence would, as a structural matter, be unlikely to be necessary to prevent incurable prejudice. This is not to say, however, that counsel's action in not appearing for a noticed hearing on the motion to consolidate was professional or excusable, nor that, in an appropriate case, a claim for ineffective assistance of counsel might succeed. However, Van's claim here is not couched in terms of ineffective assistance of counsel, nor, on this record, is it likely that he could demonstrate prejudice.

Further, the inflexible rule of reversal that would be created by declaring this hearing to be a "critical stage" would create an intolerable structural trap for the unwary state trial court and prosecutor. If this hearing is a "critical stage," then counsel Zessin, by staying away, gave his client "a get out of jail free" card. At no real cost to the possibility of a successful defense on the merits to these charges, counsel would have gotten (and in future similar cases, would be able to get) a guaranteed reversal and a second bite at the apple well down the road, when witnesses may have been lost or memories have dimmed. The expense and effort of a new trial might militate against attempting to secure the justice that was achieved in the first trial.

This seems to be too great a price to pay for applying an inflexible label that, on balance, does not appear to be the appropriate appellation. We therefore decline to label the "consolidation hearing" under Michigan procedure a critical stage of a criminal proceeding.

We also note that the difference between a severance motion and a consolidation hearing is driven primarily by who is required to make the motion. Under the procedure in most states, defendants who are charged in similar enterprises automatically would be scheduled for trial

together, and it would be the defendant's burden to make a motion to sever. If the defendant made such a motion and then failed to appear, the denial of such a motion for failure to appear could not be attacked as "absence of counsel at a critical stage," but rather would be fully justified as dismissal for failure to prosecute. In addition, such a failure to appear would simply maintain the status quo, and such a motion could presumably be renewed.

The fact that under Michigan's procedure it is the prosecution that must move should not convert defendant's situation into an immutable tactical advantage, required by the Constitution.

Finally, we note that the magistrate judge's report and recommendation relied on two grounds. One of those correctly provided some analogical support for the decision. The other did not. The judge relied by analogy on *Gerstein v. Pugh*, 420 U.S. 103, 122-23 (1975), where a proceeding that "was not adversarial in nature and [in which] no testimony was received from any witness" was held not to be a critical stage. While only useful by analogy, the logic does support the district court's decision. The second ground was that "petitioner possesses no right to be tried separately." However, the fact that a criminal defendant does not have a *right* to a particular outcome does not mean that a proceeding that involves argument over such an outcome is not a critical stage. Indeed, a defendant has no right to an acquittal at trial, or to a host of other favorable outcomes, but is certainly entitled to be represented by counsel at such stages.

## IX

The judgment of the district court denying the petition for a writ of habeas corpus is therefore affirmed.

---

**CONCURRENCE**

---

COOK, Circuit Judge, concurring.  The dissent considers whether prejudice results from counsel's absence at a consolidation hearing at a very high level of generality.  I respectfully suggest that this distant perspective elides the crucial feature of this case—the impact of Michigan Court Rules.

In the abstract, consolidation surely could expose a defendant to a risk of prejudice.  The classic example is consolidation with a more-serious offender, which risks the jury visiting the sins of one on the other.   But I take the Chief Judge's point here to be that under Michigan law, Van could not have avoided consolidation because his conduct was at least legally related to Ket's and his alleged offenses were *more* serious than those of the other defendants.  *See* MCR 6.121.  That being the state of Michigan law, there actually existed no "potential [for] substantial prejudice to [Van's] rights," *see* dissent para. 6 (quoting *United States v. Wade*, 388 U.S. 218, 227 (1967)), and the presence of counsel could not have affected the decision to consolidate.  Van's consolidation hearing thus fails to qualify as a critical stage.

———————

**DISSENT**

———————

KAREN NELSON MOORE, Circuit Judge, dissenting.  I disagree with the majority's conclusion that a defendant's consolidation hearing is not a critical stage of his prosecution. Accordingly, I respectfully dissent.

Roeur Van ("Van") was tried for assault with intent to commit murder in a consolidated trial in Michigan state court with co-defendant Vanna Ket ("Ket").  The two men were originally indicted separately, and the prosecution moved to consolidate their trials along with two other co-defendants.[1]  *Id*.  Unlike the other three defendants at the consolidation hearing, Van's counsel did not appear on his behalf.  *Id*.  At the hearing, the prosecutor made legal arguments in favor of the state's motion to consolidate.  Van, a Cambodian immigrant with limited English skills and no legal training, stood silently throughout the hearing, and the state judge never even acknowledged Van's presence in the room.  The state judge ruled in the prosecution's favor and consolidated the trials. Van was convicted of one count of assault with intent to commit murder and sentenced to fifteen to thirty years of imprisonment.

The Sixth Amendment ensures that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. CONST. amend. VI.  Where a defendant "is denied the presence of counsel at 'a critical stage,'" we reverse his or her conviction under the Sixth Amendment.  *Bell v. Cone*, 535 U.S. 685, 695 (2002) (quoting *United States v. Cronic*, 466 U.S. 648, 659 (1984)).  We do not require that the defendant show any prejudice, and we do not inquire into what effect counsel's absence had on the trial.  *Id*.  Rather, "'the complete denial of counsel during a critical stage of a judicial proceeding mandates a presumption of prejudice,'" and is "per se reversible error."  *French v. Jones*, 332 F.3d 430, 436, 438 (6th Cir. 2003) (quoting *Roe v. Flores Ortega*, 528 U.S. 470, 483 (2000)).  In these cases, counsel's absence is "'so likely to prejudice the accused that the cost of litigating the[] effect in a particular case is unjustified.'"  *Bell*, 535 U.S. at 695 (quoting *Cronic*, 466 U.S. at 658-59)).

It follows that we may not inquire into the particulars of the case at bar when analyzing whether an event or proceeding constitutes a critical stage.  The majority and concurrence address the critical stage question by examining the details of the case at bar and asking whether Van was prejudiced by his counsel's absence under the particular facts of this case.  By approaching the issue in this manner, they are engaging in an inquiry as to whether Van suffered prejudice.  This approach does an end run around the rule that prejudice is presumed where one is denied counsel during a critical stage.  *Id*.  In our determination of whether a proceeding or event constitutes a critical stage, we must broadly examine whether an unrepresented defendant would be subject to an unacceptable risk of prejudice.  Contrary to what the concurrence states, a "distant perspective" is exactly what is required when inquiring into whether a particular type of pre-trial proceeding constitutes a critical stage.  Concurring Op. at 22.

There is no question that Van's counsel was absent from the consolidation hearing.  Thus, if the consolidation hearing is a critical stage of the prosecution, our path is clear—we must grant Van's habeas petition under the Sixth Amendment.  The task before us is to define what constitutes a critical stage and to determine (without inquiring into the particulars of Van's case) whether a consolidation hearing qualifies as such.

———————

[1]The two other co-defendants ultimately pleaded guilty, and thus were not tried with Van and Ket.

A critical stage is "a step of a criminal proceeding . . . that h[olds] significant consequences for the accused." *Id.* at 696 (footnote omitted). In determining whether a type of proceeding or event is a critical stage, we look at whether that particular stage has the "potential [for] substantial prejudice to [a] defendant's rights . . . ." *United States v. Wade*, 388 U.S. 218, 227 (1967). Also helpful to our analysis is an examination of "whether the accused required aid in coping with legal problems or assistance in meeting his adversary." *United States v. Ash*, 413 U.S. 300, 313 (1973), *quoted in Patterson v. Illinois*, 487 U.S. 285, 298 (1988). Where a proceeding is adversarial, "counsel [is] needed to render 'Assistance' in counterbalancing any 'overreaching' by the prosecution." *Id.* at 314.

We have said that the period from arraignment to trial is "'perhaps the most critical period of the proceedings . . . .'" *Mitchell v. Mason*, 325 F.3d 732, 743 (6th Cir. 2003) (quoting *Powell v. Alabama*, 287 U.S. 45, 57 (1932)). Because so much of what occurs during the pre-trial period may affect the ultimate outcome in a case, a variety of proceedings and events during the pre-trial process have been identified as critical stages. *See, e.g., Estelle v. Smith*, 451 U.S. 454, 471 (1981) (consent to a psychiatric interview); *Wade*, 388 U.S. 218, 236-37 (pretrial lineup); *White v. Maryland*, 373 U.S. 59, 60 (1963) (preliminary hearings); *Mitchell*, 325 F.3d at 748 (pretrial investigation); *Sullivan v. Pitcher*, 82 F. App'x 162, 165 (6th Cir. 2003) (unpublished) (plea hearing); *United States v. Collins*, 430 F.3d 1260, 1264 (10th Cir. 2005) (competency hearing); *United States v. Hamilton*, 391 F.3d 1066, 1070 (9th Cir. 2004) (suppression hearing). With the foregoing in mind, I examine the features of a consolidation hearing.

A defendant who is unrepresented by counsel at a consolidation hearing is exposed to a serious risk of prejudice. Although the decision as to whether a defendant will be tried alone or with co-defendants may affect the outcome of a case, an unrepresented accused may be unlikely to realize the consequences of failing to challenge a motion to consolidate. Thus, he or she may not challenge the motion even where the potential consequences in joining other defendants may be devastating to the unrepresented accused. For example, evidence of a co-defendant's wrongdoing could lead the jury to the erroneous conclusion that the defendant is guilty. *Zafiro v. United States*, 506 U.S. 534, 539 (1993). A jury could erroneously convict "if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." *Id.* Other potential prejudice might arise if jointly tried defendants' defenses are "mutually antagonistic." *Id.* at 538.

The fact that joint trials are often favored at law highlights the need for counsel at the consolidation hearing. *See id.* at 537; M.C.R. 6.121, 1989 staff cmt. A judge is likely to consolidate unless the accused brings forth compelling reasons not to do so. Thus, the unrepresented defendant faces all the more difficulty in protecting himself or herself from the potential harms of a joint trial.

The consolidation hearing is adversarial. It takes place in a courtroom, in front of a judge, with the prosecution marshaling legal arguments in favor of the state's position to join the defendants. *See* M.C.R. 6.121; M.C.R. 6.120. This is the very type of trial-like, adversarial setting where the unrepresented defendant is subject to substantial prejudice without "the guiding hand of counsel." *Wade*, 388 U.S. at 225 (quoting *Powell*, 287 U.S. at 69). At a consolidation hearing "the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary, or by both." *Ash*, 413 U.S. at 310. The judge listens to arguments, probes counsel, and renders a decision. In this setting, it is without question that an unrepresented defendant in a consolidation proceeding faces the potential for tremendous prejudice.

I would hold that a consolidation hearing does constitute a critical stage of the pretrial process, that under the Sixth Amendment a defendant is entitled to counsel at this proceeding, and that denial of counsel at this stage is per se reversible error. Because Van was undisputedly without representation at the consolidation hearing, I would grant Van's petition for habeas corpus. Accordingly, I dissent.